**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Shalynda HARRIS, Defendant– Appellant.**

**No. 99–1994.**

United States Court of Appeals, Seventh Circuit.

Argued Nov. 2, 1999.

Decided Nov. 30, 1999.

Joe Vaughn (argued), Office of the United States Attorney, Indianapolis, IN, for plaintiff-appellee.

William E. Marsh (argued), Indiana Federal Community Defenders, Inc., Indianapolis, IN, for defendant-appellant.

Before COFFEY, FLAUM and KANNE, Circuit Judges.

FLAUM, Circuit Judge.

Shalynda Harris appeals her conviction for bank robbery following a jury trial. Harris challenges the district court's decision permitting the government to exercise a peremptory strike against a disabled juror claiming that this procedure violated her due process rights under the Fifth Amendment. For the reasons stated herein, we conclude that Harris' constitutional rights were not violated, and we affirm.

## I. BACKGROUND

On September 15, 1998, an indictment was returned against Shalynda Harris for one count of armed robbery of a credit union in violation of 18 U.S.C. § 2113. On November 16, 1998, the jury venire was assembled for Harris' case. Ms. Heidi Wilson was the only African–American on the randomly selected venire.

During voir dire, the district court asked if any of the jurors had a condition, such as dyslexia or being hard of hearing, of which the court should be aware so that accommodation could be arranged. In response, Ms. Wilson stated that she had multiple sclerosis [1] and that she was on medication to control it, but that she might have trouble climbing stairs and staying awake. The court asked Ms. Wilson if she would be sufficiently accommodated if she were provided access to an elevator and if the court would monitor Ms. Wilson and rouse her if she appeared to be becoming drowsy. Ms. Wilson apparently assented, although no verbal response is found in the record, and the court did not excuse her for cause. During subsequent questioning, Ms. Wilson revealed that her former occupation had been as a day care provider at her church and that her husband's uncle was a constable in Marion County, Indiana.

At the close of voir dire, the government used one of its peremptory challenges to strike Ms. Wilson. Because Ms. Wilson is African–American, the court, pursuant to *Batson*, asked the government for a race-neutral reason for the strike. The government stated that the strike was made "on the basis of the fact that she is on medi-

cation, and that sleep may be a problem for her with her multiple sclerosis." [2] Harris objected to the exclusion of Ms. Wilson on this basis. The district court ruled that the peremptory challenge was permissible and excused Ms. Wilson from the venire. The petit jury was seated and, after a two-day trial, convicted Harris of bank robbery. Harris now appeals.

## II. DISCUSSION

### A. STANDARD OF REVIEW

 Defendant argues that the government's exercise of a peremptory challenge to strike a juror because of her disability is a violation of her due process rights under the Fifth Amendment. The government contends that the defendant failed to object to its exercise of a peremptory challenge against Ms. Wilson for reasons related to her disability. If this were so, we would review the district court's decision to allow the strike for plain error. *See United States v. Chandler*, 12 F.3d 1427, 1431–32 (7th Cir.1994). However, it is clear from the record that the defendant objected vigorously and repeatedly to each reason the government gave for excluding Ms. Wilson from the jury. The issue of the constitutionality of the strike was therefore preserved. Because this is purely a question of law, we review it *de novo*. *See Pierce v. Underwood*, 487 U.S. 552, 558, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988).

### B. PEREMPTORY CHALLENGE

Jury selection procedures implicate not only the right of the accused to be tried by

---

1. Ms. Wilson used the term "MS" in her response to this question. All parties agree that this abbreviation stands for multiple sclerosis.

2. The government's initial reason for excluding Ms. Wilson was based on her past employment as a church day care worker and a concern that "the principles of Christianity involving forgiveness of sins of others" would make her overly sympathetic to the defense. The district court refused to allow the per-

emptory on this basis. The court then noted that it was concerned because Ms. Wilson had initially expressed that she had difficulty staying awake due to her MS. In response, the government supplied Ms. Wilson's admitted drowsiness as the race-neutral reason for its strike, which the district court accepted. While this aspect of the voir dire procedure appears somewhat irregular, defendant does not challenge it on appeal, and we do not address it in this opinion.

an impartial jury of her peers, but also the right of potential jurors to be involved in the "significant opportunity to participate in civic life" that is presented by jury service. *Powers v. Ohio*, 499 U.S. 400, 409, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991); *see also J.E.B. v. Alabama*, 511 U.S. 127, 128, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994); *Batson v. Kentucky*, 476 U.S. 79, 87, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). In addition, the process of selecting a jury "touch[es] the entire community" and impacts "public confidence in the fairness of our system of justice." *Batson*, 476 U.S. at 87, 106 S.Ct. 1712. Because such important rights are implicated, courts have been especially vigilant to ensure that no taint of discrimination touches the jury selection process. *See, e.g., Alexander v. Louisiana*, 405 U.S. 625, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972); *Hernandez v. Texas*, 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866 (1954); *Neal v. Delaware*, 103 U.S. 370, 26 L.Ed. 567 (1880); *Ex parte Virginia*, 100 U.S. 339, 25 L.Ed. 676 (1879); *Strauder v. West Virginia*, 100 U.S. 303, 25 L.Ed. 664 (1879).

For over a century, the right to exercise peremptory challenges has been held to be one of the jury selection procedures "essential to the fairness of trial by jury." *Lewis v. United States*, 146 U.S. 370, 376, 13 S.Ct. 136, 36 L.Ed. 1011 (1892); *see also Pointer v. United States*, 151 U.S. 396, 408, 14 S.Ct. 410, 38 L.Ed. 208 (1894). By enabling all parties to a dispute to remove jurors who might be biased against them, peremptory challenges work to preserve the impartiality of the jury and the proper functioning of the judicial process. *Swain v. Alabama*, 380 U.S. 202, 219–20, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965) ("The function of the challenge is not only to eliminate extremes of partiality on both sides, but to assure the parties that the jurors before whom they try the case will decide on the basis of the evidence placed before them, and not otherwise."). However, there is tension between the idea that "[t]he essential nature of the peremptory challenge is that it is one exercised without a reason stated, without inquiry and without being subject to the court's control," *id.* at 220, 85 S.Ct. 824, and the concept that "the defendant does have the right to be tried by a jury whose members are selected pursuant to nondiscriminatory criteria," *Batson*, 476 U.S. at 85–86, 106 S.Ct. 1712.

■ The Supreme Court has resolved this tension by applying its traditional equal protection analysis to the classes of persons against whom peremptory challenges are allegedly being applied in a discriminatory manner. *See Batson*, 476 U.S. at 89, 106 S.Ct. 1712 ("[T]he State's privilege to strike individual jurors through peremptory challenges[ ] is subject to the commands of the Equal Protection Clause."). Under this analysis, state action affecting suspect and quasi-suspect classes receives "heightened" scrutiny, where both the government's ends and the means used to achieve them are examined. *See City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 440, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) (stating classes based on race, alienage or national origin receive "strict scrutiny"); *id.* at 440–41, 105 S.Ct. 3249 (stating classes based on gender or illegitimacy receive "heightened review"). In the context of peremptory challenges, the Supreme Court has stated that "the only legitimate interest [the state] could possibly have in the exercise of its peremptory challenges is securing a fair and impartial jury." *J.E.B.*, 511 U.S. at 137 n. 8, 114 S.Ct. 1419. In *Batson*, the Court found that it is impermissible to use race-based peremptory challenges as a means to serve this end because "[a] person's race simply 'is unrelated to his fitness as a juror.'" 476 U.S. at 87, 106 S.Ct. 1712 (quoting *Thiel v. Southern Pacific Co.*, 328 U.S. 217, 227, 66 S.Ct. 984, 90 L.Ed. 1181 (1946) (Frankfurter, J., dissenting)). Similarly, in *J.E.B.*, the Court prohibited the use of gender-based peremptories because "gender simply may not serve as a proxy for bias." 511 U.S. at 143, 114 S.Ct. 1419. In both cases, the

Court emphasized the harm to the community and the erosion of confidence in the judicial process that results when "invidious group stereotypes" that have "wreaked injustice in so many other spheres of our country's public life" are used as the basis for peremptory challenges. *J.E.B.*, 511 U.S. at 140, 114 S.Ct. 1419; *see also Batson*, 476 U.S. at 87, 106 S.Ct. 1712.

At the same time, however, the Supreme Court has continued to acknowledge the important role that peremptory challenges play in the selection of an unbiased jury because this procedure allows parties to remove jurors when they have *legitimate* concerns about the their impartiality. Because only the most basic character traits can be gleaned from voir dire, this practice necessarily involves making generalizations about groups or classes of persons. However, where a classification is subject only to "rational basis" review, the state may use its peremptory challenges to strike jurors for any reason rationally related to the selection of an impartial jury.[3] This is because "[w]here peremptory challenges are made on the basis of group characteristics other than race or gender ..., they do not reinforce the same stereotypes about the group's competence or predispositions that have been used to prevent them from ... contributing to civic life." *J.E.B.*, 511 U.S. at 142 n. 14, 114 S.Ct. 1419. Therefore, these other characteristics may be used to excuse jurors because of concerns about their potential bias, even if that bias flows from stereotypes related to group membership. *Id.* at 143, 114 S.Ct. 1419; *see, e.g., Massachusetts Bd. of Retirement v. Murgia*, 427 U.S. 307, 313, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976) (holding the "aged" are not a suspect class); *United States v.*

*Mojica*, 984 F.2d 1426, 1451 (7th Cir.1993) (finding government's use of peremptory challenges to strike jurors based on age does not violate the Equal Protection Clause).

Because traditional equal protection analysis applies to Harris' claim that the government's peremptory challenge was used to discriminate against a member of the class of persons with disabilities, the next step in our analysis is to determine which standard of scrutiny applies to that class. Neither the Supreme Court nor this Court has definitively stated that persons with disabilities are not a suspect or quasi-suspect class. Other circuits that have considered this question, however, have determined that alleged discrimination against the class of the "disabled" does not receive heightened scrutiny. *See More v. Farrier*, 984 F.2d 269, 271 (8th Cir.1993); *DeVargas v. Mason & Hanger-Silas Mason Co., Inc.*, 844 F.2d 714, 725 (10th Cir.1988); *California Assn. of the Physically Handicapped, Inc. v. FCC*, 721 F.2d 667, 670 (9th Cir.1983); *Brown v. Sibley*, 650 F.2d 760, 765–66 (5th Cir.1981).

In *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985), the Supreme Court held that mentally retarded persons, a subset of the disabled class, were neither a suspect nor a quasi-suspect class and applied rationality review to a claim of discrimination presented by this group. *Id.* at 446, 105 S.Ct. 3249. The Court gave four reasons for making this determination. First, the Court found that the mentally retarded have a "reduced ability to cope with and function in the everyday world" and are not "all cut from the same pattern." *Id.* at 442, 105 S.Ct. 3249. Second, the response of lawmakers to the needs of the mentally retarded does not

---

**3.** By stating that a party must have a "rational basis" for peremptory challenges, we do not imply that a party may be required to provide a reason for the challenges he or she chooses to exercise against members of nonsuspect classes. Peremptory strikes of class members not entitled to heightened scrutiny remain "challenges without cause, without explanation and without judicial scrutiny." *Swain*, 380 U.S. at 211–12, 85 S.Ct. 824. They are presumed legitimate and may not be questioned absent a showing that the strike is not rationally related to a legitimate state end.

demonstrate "a continuing antipathy or prejudice and a corresponding need for more intrusive oversight by the judiciary." *Id.* at 443, 105 S.Ct. 3249. Third, the class is not "politically powerless" because legislation was passed in response to the needs and concerns of the class. *Id.* at 445, 105 S.Ct. 3249. Finally, the Court found that it would be difficult to "distinguish a variety of other groups who have perhaps immutable disabilities setting them off from others, who cannot themselves mandate the desired legislative responses, and who can claim some degree of prejudice ... [such as] the aging, *the disabled*, the mentally ill, and the infirm." *Id.* at 445–46, 105 S.Ct. 3249 (emphasis added).

Like the Supreme Court, we cannot make a principled distinction between assessing the disabled in general and the approach taken to the mentally retarded who were found not to be a suspect class in *Cleburne*. As with the state legislation in *Cleburne*, the enactment of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.*, and comparable state laws, *see, e.g.*, 775 Ill. Comp. Stat. 5/2–105; Ind.Code 22–9–1–2; Wis. Stat. § 106.04; Cal. Gov't Code § 11135; N.Y. Exec. Law § 296, casts doubt on the political powerlessness of the disabled as a group. Furthermore, the disabled, like the mentally retarded, is a "large and amorphous class," *Cleburne*, 473 U.S. at 445, 105 S.Ct. 3249, composed of persons with myriad mental, emotional and physical conditions. *See* John F. Wagner, What Constitutes Substantial Limitation on Major Life Activity of Working for Purposes of Americans with Disabilities Act, 141 A.L.R. Fed. 603 (1997) (discussing the numerous impairments that qualify as "disabilities" under the ADA). Some of these conditions may form the basis of unfounded stereotypes and prompt discriminatory treatment arising out of irrational fear, but others may not. We are skeptical that this group can be considered a "discrete and insular minority" as that term has been used in equal protection jurisprudence. *See United States v. Carolene Products Co.*, 304 U.S. 144, 152–3 n. 4, 58 S.Ct. 778, 82 L.Ed. 1234 (1938).

Most importantly, as with the mentally retarded, there are "real and undeniable differences between the [disabled] and others," and "governmental consideration of those differences in the vast majority of situations is not only legitimate but also desirable." *Cleburne*, 473 U.S. at 444, 105 S.Ct. 3249. This is especially true in the context of jury service. Unlike race or gender, disability may legitimately affect a person's ability to serve as a juror. For example, disabled potential jurors who would be unable to understand testimony at trial or who would suffer pain or hardship from spending hours each day sitting in a courtroom are properly excused from service for cause. In addition, there are some disabilities, like Ms. Wilson's multiple sclerosis, that may not rise to the level of an exclusion for cause, but may, in a given case, provide a party legitimate concern about a potential juror's ability to serve. The narrow limitations on peremptory challenges provided by *Batson* and *J.E.B.* are "a special rule of relevance, a statement about what this Nation stands for" that is "a product of the unique history of ... discrimination in this country." *Brown v. North Carolina*, 479 U.S. 940, 940, 107 S.Ct. 423, 93 L.Ed.2d 373 (1986) (O'Connor, J., concurring in denial of certiorari). Unlike race or gender, the broad category of "disability" is not "unrelated to [a person's] fitness as a juror." *Batson*, 476 U.S. at 87, 106 S.Ct. 1712 (quotation omitted).

▮▮▮ Harris also argues that Congress, through the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*, has created the disabled as a suspect class. It is true that Congress found that the disabled are a "discrete and insular minority", 42 U.S.C. § 12101(a)(7), who have suffered a history of discrimination and political powerlessness, 42 U.S.C. § 12101(a)(2), (4), (6). However, Congress does not have the power to create constitu-

tional rights or declare a class of persons "suspect" under the Fourteenth Amendment. *See City of Boerne v. Flores,* 521 U.S. 507, 519, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997) ("The design of the [Fourteenth] Amendment and the text of § 5 are inconsistent with the suggestion that Congress has the power to decree the substance of the Fourteenth Amendment's restrictions on the States."). Rather, "[i]t is emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison,* 1 Cranch 137, 5 U.S. 137, 177, 2 L.Ed. 60 (1803). With due deference to the congressional approach to legislation affecting the disabled, this Court chooses to follow the lead of our fellow circuit courts and the direction indicated by the Supreme Court to conclude that the disabled are not a suspect or quasi-suspect class. Therefore, we apply rationality review to claims of discrimination made by persons in this class.

■ In this case, the government used one of its peremptory challenges to strike Ms. Wilson because her disability, or the medication taken to control her disability, made her prone to drowsiness. Harris contends that this action deprived her of the right to be tried by a jury selected according to non-discriminatory criteria and denied Ms. Wilson her right to participate in the civic responsibility of jury service. As noted above, peremptory challenges made on the basis of a person's disability are scrutinized under rationality review. Consequently, the strike must be rationally related to the state's legitimate purpose of selecting an impartial jury.

■ Ordinarily, a peremptory challenge of a member of a class subject only to rationality review will not be scrutinized by the court. However, because Harris contests even the rationality of Ms. Wilson's exclusion, we will briefly discuss the peremptory exercised here. If the government had struck Ms. Wilson because of an irrational animosity toward or fear of disabled people, this would not be a legitimate reason for excluding her from the jury. *See Milner v. Apfel,* 148 F.3d 812, 817 (7th Cir.1998) ("If a law is challenged as a denial of equal protection, and all that the government can come up with in defense of the law is that the people who are hurt by it happen to be irrationally hated or irrationally feared by a majority of voters, it is difficult to argue that the law is rational."); *see also Cleburne,* 473 U.S. at 449–50, 105 S.Ct. 3249. However, the government in this case struck Ms. Wilson because its stated concern, accepted by the district court, was that she would become drowsy and would not be able to pay attention during the trial. This is a legitimate concern that is rationally related to the provision of a fair trial for Harris. Therefore, the government's use of its peremptory challenge to strike Ms. Wilson for reasons related to her disability did not violate the equal protection rights of either Harris or Ms. Wilson.

### III. CONCLUSION

For the foregoing reasons, the ruling of the district court permitting the government to strike a juror for reasons related to her disability is AFFIRMED.