## S02P1702. SALLIE v. THE STATE.
(578 SE2d 444)

SEARS, Presiding Justice.

A jury found William C. Sallie guilty of malice murder, felony murder, burglary, aggravated assault, two counts of kidnapping with bodily injury, and possession of a firearm during the commission of a felony. The jury recommended a death sentence after finding beyond a reasonable doubt three aggravating circumstances: that the offense of murder was committed while Sallie was engaged in the commission of a burglary; and that the offense of murder was committed while Sallie was engaged in the commission of the kidnappings with bodily injury of the murder victim's two daughters.[1] Sallie appeals and we affirm.[2]

1. The evidence presented at trial showed the following: William Sallie and his wife, Robin, separated in December 1989 and Robin sought a divorce. Sallie had been physically abusive to Robin during

---

[1] OCGA § 17-10-30 (b) (2).

[2] The crimes were committed on March 29, 1990. Sallie's convictions and death sentence from his first trial were reversed in *Sallie v. State*, 269 Ga. 446 (499 SE2d 897) (1998). On June 26, 2000, he was re-indicted for malice murder, felony murder, burglary, aggravated assault, kidnapping with bodily injury (two counts), and possession of a firearm during the commission of a felony. The State re-filed its notice of intent to seek the death penalty on June 28, 2000. After a change of venue, the trial took place from February 16 to March 5, 2001. On March 2, 2001, the jury convicted Sallie on all counts, and they recommended a death sentence for the malice murder on March 5, 2001. In addition to the death sentence, the trial court sentenced Sallie to life imprisonment for each kidnapping with bodily injury conviction, 20 years for aggravated assault, and 20 years for burglary, to be served concurrently with the death sentence. The trial court also sentenced Sallie to five years for possession of a firearm during the commission of a felony to be served consecutive to the death sentence. The felony murder conviction was vacated by operation of law. *Malcolm v. State*, 263 Ga. 369 (4) (434 SE2d 479) (1993). Sallie filed a motion for new trial on April 3, 2001, which was amended on April 17, 2002, and denied by the trial court on June 17, 2002. Sallie filed a notice of appeal on July 8, 2002, and the case was docketed with this Court on July 23, 2002. The case was orally argued on November 18, 2002.

their marriage and his striking her with a belt had precipitated the separation. They had a two-year-old baby named Ryan. Robin and Ryan went to live with her parents, John and Linda Moore, in their rural house in Bacon County. Robin's seventeen-year-old sister, April, and her nine-year-old brother, Justin, also lived there. Shortly thereafter, under the pretense of seeing Ryan at the Moores' house, Sallie abducted Ryan and went to Illinois, where he lived. However, an Illinois court awarded temporary custody of Ryan to Robin, and she returned with him to the Moores' house in February 1990.

In March 1990, Sallie returned to Georgia and rented a mobile home in Liberty County using the name Bill Simons. Also in March, he had a friend purchase a nine millimeter pistol for him in Illinois. On March 28, 1990, Sallie dressed in green camouflage and went to the Moores' house at night; he carried the pistol, a roll of duct tape, and four sets of handcuffs. At approximately 10:00 p.m., April was talking to her boyfriend when the phone line went dead. She did not think this was unusual and went to bed. It was later discovered that Sallie had ripped the wires from the phone box on the outside wall. At 12:45 a.m., after everyone inside was asleep, Sallie pried open the back door and entered the house. He went immediately to the master bedroom, flicked on the lights, and shot John and Linda Moore as they lay in bed. John was struck by six bullets, including two that damaged his heart. He tried to get out of bed, but he collapsed, fell on the floor, and died. Linda was shot in the thumb, the shoulder, and both thighs. Sallie then fled outside and reloaded. When Robin and April were in the master bedroom trying to help their parents, Sallie fired two more shots through the bedroom window, hitting no one. They doused the light and pleaded with Sallie to let them get help for their parents. April tried to leave the house to get help (the nearest neighbor was 1/4 of a mile away), but Sallie confronted her on the porch and told her to stay in the house or he would blow her head off. Sallie eventually re-entered the house and handcuffed Justin and Linda, who was still bleeding from her wounds, to each other and to a bed rail. He bound Robin and April to each other with handcuffs and duct tape, and he abducted them to his Liberty County mobile home where he raped them both. He left his two-year-old son in the master bedroom. After a few hours, Linda and Justin managed to extricate themselves from the bed rail and reach a neighbor, who summoned the police. Sallie released Robin and April in Bacon County the night of March 29 after asking them not to press charges. He was arrested shortly thereafter. The police found the murder weapon in his mobile home.

The evidence was sufficient to enable a rational trier of fact to

find Sallie guilty of the crimes charged beyond a reasonable doubt.[3] The evidence was also sufficient to enable the jury to find the existence of the three statutory aggravating circumstances beyond a reasonable doubt.[4]

2. Sallie argues that the trial court erred by refusing to excuse two prospective jurors for cause due to their bias in favor of the death penalty. "The proper standard for determining the disqualification of a prospective juror based upon his views on capital punishment 'is whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." ' [Cit.]"[5] A prospective juror who has an unwavering bias in favor of one of the possible sentences authorized by law, to the exclusion of at least one of the other possible sentences, is not qualified to serve.[6] We view the record as a whole to determine support for the trial court's findings, and we pay deference to the trial court's resolution of any conflicts or equivocations in the prospective juror's voir dire responses as well as its ultimate determination of a juror's qualification.[7] "Whether to strike a juror for cause is within the discretion of the trial court and the trial court's rulings are proper absent some manifest abuse of discretion."[8]

(a) Prospective juror Harper stated that if someone committed murder he should get the death penalty and that he believed in an eye for an eye. However, he could also consider both life imprisonment options for someone guilty of murder, and he could vote for them in "[c]ertain situations." When asked by defense counsel to explain his eye for an eye belief, Mr. Harper stated, "And if somebody has created or somebody has done a criminal activity that is a heinous crime, I believe the death penalty is the answer for that. Now, there are certain situations that I believe that maybe the death penalty is not imposed." He acknowledged that not all murderers get the death penalty under Georgia law, and he also acknowledged, in response to questioning by defense counsel, that if the trial reaches the penalty phase the jury would have ruled out accident or self-defense. Mr. Harper said that he would consider the circumstances of the crime when considering punishment, and not evidence about the defendant's background. He later stated, however, that he could consider mitigating evidence about a defendant's life experiences and background and that it could sway his vote. Before jury selection, Mr.

---

[3] *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

[4] Id.; OCGA § 17-10-35 (c) (2).

[5] *Greene v. State*, 268 Ga. 47, 48 (485 SE2d 741) (1997).

[6] See *Lance v. State*, 275 Ga. 11 (8) (560 SE2d 663) (2002); *Rhode v. State*, 274 Ga. 377 (6) (552 SE2d 855) (2001).

[7] See *Greene*, supra at 49.

[8] Id. at 50.

Harper reaffirmed that he could consider all three sentencing options and mitigation evidence about a defendant's background. Viewing the prospective juror's responses as a whole, this Court finds no abuse of discretion in the trial court's denial of Sallie's motion to excuse Mr. Harper for cause.[9] Although he leaned toward a death sentence, Mr. Harper did not have an unwavering bias in favor of the death penalty; he could consider and vote for all three punishment options.[10]

(b) Prospective juror Chasteen indicated that he could vote for all three sentencing options for someone convicted of murder. Mr. Chasteen said he did not know if he could consider a defendant's life history and background before making a decision as to sentence, but he then said, "It would only be fair. Yes, I would have to consider it." When defense counsel later asked him if he would consider facts about the defendant not having anything to do with the murder when determining punishment, Mr. Chasteen said he did not think so. He later stated that he would consider all the evidence presented in the case, including mitigating evidence about the defendant's background, before making a sentencing decision. Viewing Mr. Chasteen's voir dire responses as a whole, we conclude that the trial court did not abuse its discretion by qualifying him to serve on the jury. The record shows that Mr. Chasteen was willing to listen to the defendant's mitigation evidence and meaningfully consider all three possible sentences.[11]

3. The trial court did not improperly restrict Sallie's voir dire questions. Sallie sought to ask some prospective jurors a number of questions that involved technical, legal issues or that called for prejudgment on the part of the prospective jurors. Some examples of the denied voir dire questions were:

> "If the jury finds beyond a reasonable doubt the defendant is guilty of murder and further finds beyond a reasonable doubt that statutory aggravating circumstances exist, or a statutory aggravating circumstance exists, and further find no mitigating circumstances exist, could you nevertheless consider mercy?"; and

> "In reaching the ultimate decision are you going to be able to factor in matters like . . . [the defendant's] age; what the guy's done in the last 10 years since the offense; what the guy's military record was like; has he shown indication that

---

[9] See id. at 48-50; *Lance*, supra at 15-16 (8); *King v. State*, 273 Ga. 258 (18) (a), (b) (539 SE2d 783) (2000).

[10] Id.

[11] See *King*, supra at 266 (18) (b).

the conduct at issue that led to the criminal charges was out of context . . . Would any of those matters, could you take them into account in the sentencing decision[?]"

" 'The single purpose for voir dire is the ascertainment of the impartiality of jurors, their ability to treat the cause on the merits with objectivity and freedom from bias and prior inclination. . . .' [Cit.]"[12] Questions of a technical legal nature and questions that call for prejudgment are improper in a voir dire examination.[13] Since there is often a fine line between asking potential jurors how they would decide the case and questions that merely seek to expose bias or prejudice, the scope of the voir dire examination, of necessity, must be left to the sound discretion of the trial court.[14] After viewing the record, we conclude that the lengthy voir dire in this case was sufficient to ascertain the fairness and impartiality of the prospective jurors.[15] We find no abuse of discretion by the trial court.

4. Prospective juror Dawson was qualified to serve as a juror. She indicated no bias and she stated that she could consider and vote for all three sentencing options.[16] Although she has strong religious beliefs, she expressly stated that her religious beliefs would not prevent her from following Georgia law and the trial court's instructions.

5. Sallie complains that the trial court erred by excusing four prospective jurors for cause. Prospective juror Anderson clearly stated that he could not sit in judgment of anyone for religious reasons, and he did not think he could return a verdict. The trial court was authorized to excuse him for cause.[17] The trial court also did not err by excusing prospective jurors Colbert and Minor for cause because they could never vote to impose a death sentence.[18] Prospective juror Rainey had been previously treated for schizophrenia and other mental health problems, and he exhibited bizarre behavior while waiting to be questioned on voir dire. His answers to voir dire questions were often disconnected and rambling. The trial court consulted with Mr. Rainey's doctor, who opined in writing that Mr. Rainey was mentally ill and "incapable of serving on a jury." The trial court's subsequent decision to excuse Mr. Rainey for cause was not an

---

[12] *Speed v. State*, 270 Ga. 688, 691 (7) (512 SE2d 896) (1999).

[13] See *Blankenship v. State*, 258 Ga. 43 (6) (365 SE2d 265) (1988); *Baxter v. State*, 254 Ga. 538 (7) (331 SE2d 561) (1985).

[14] *Curry v. State*, 255 Ga. 215 (2) (b) (336 SE2d 762) (1985).

[15] See *Pace v. State*, 271 Ga. 829 (14) (524 SE2d 490) (1999); *Barnes v. State*, 269 Ga. 345 (10) (496 SE2d 674) (1998).

[16] See *Greene*, supra at 48-50.

[17] See *Lance*, supra at 17 (10); *Greene*, supra at 50 (whether to strike a juror for cause is within the discretion of the trial court).

[18] See *Greene*, supra at 48-50.

abuse of discretion.[19]

6. Sallie claims that the State engaged in racial and gender discrimination in the exercise of its peremptory strikes.[20] Although the trial court found no prima facie case of discrimination, it nonetheless required the State to list its reasons for its peremptory strikes. Pretermitting the trial court's finding on the existence of a prima facie case of discrimination, we conclude that the proffered reasons were sufficient to rebut a prima facie case of discrimination under *J. E. B.* and *Batson*.[21] All of the prospective jurors struck by the State, except for a white man who ministered to inmates, were reluctant or hesitant to vote to impose a death sentence. One of the prospective jurors who was hesitant on the death penalty also had health problems that could hinder her ability as a juror. These reasons provided by the State are supported by the voir dire transcript and are race and gender neutral.[22] We therefore find no error in the State's exercise of its peremptory strikes.

7. Shortly after beginning deliberations in the penalty phase, the jury sent a note to the trial court asking, "If a prisoner receives a sentence of life without parole, are there *any* circumstances that a prisoner can ever be released from prison?" The jury had the trial court's charge in writing with them in the jury room. That charge contained the definition of life imprisonment without parole: "Under our law, 'life imprisonment without parole' means the defendant shall be incarcerated for the remainder of his natural life and shall not be eligible for parole." It was not error for the trial court to instruct the jury to refer to this portion of the charge.[23]

8. Sallie failed to prove that disabled persons are systematically excluded from serving on the Bacon County grand jury.[24] His anecdotal evidence supplied by the court clerk and a grand jury bailiff, that they could not recall seeing a grand juror in a wheelchair or with a cane, was insufficient to establish an exclusion since the "physically disabled" include people with a wide range of physical infirmities, many of which are not readily apparent.[25] He also failed to show that the "physically disabled" are a distinctive group under a Sixth

---

[19] OCGA § 15-12-163 (b) (3) and (c); *Greene*, supra at 50.

[20] See *J. E. B. v. Alabama*, 511 U. S. 127 (114 SC 1419, 128 LE2d 89) (1994); *Batson v. Kentucky*, 476 U. S. 79 (106 SC 1712, 90 LE2d 69) (1986).

[21] See *Jenkins v. State*, 269 Ga. 282 (11) (498 SE2d 502) (1998).

[22] See id.; *Barnes*, 269 Ga. at 349-351 (6); *Jackson v. State*, 265 Ga. 897 (2) (463 SE2d 699) (1995) (" 'Unless a discriminatory intent is inherent in the . . . (proponent's) explanation, the reason offered will be deemed race neutral.' [Cit.]").

[23] See *McClain v. State*, 267 Ga. 378 (5) (477 SE2d 814) (1996).

[24] See *Smith v. State*, 275 Ga. 715 (571 SE2d 740) (2002); *Morrow v. State*, 272 Ga. 691 (1) (532 SE2d 78) (2000).

[25] See *Morrow*, supra.

Amendment analysis.[26] In addition, with regard to equal protection, the United States Supreme Court has not determined that the physically disabled constitute a "suspect" or "quasi-suspect" class.[27] "Unlike race or gender, disability may legitimately affect a person's ability to serve as a juror."[28] One of the jury commissioners testified that disabled people selected for grand jury service may voluntarily seek and be granted excusal on a medical hardship basis if they provide supporting documentation from their doctor.[29] This is not unreasonable or illegal.[30]

9. There was no error with the jury charges in the guilt-innocence and penalty phases of Sallie's trial.

(a) *Guilt-innocence phase.* The trial court properly charged the jury on intent and the burden of proof for each element of the charged offenses. The trial court did not err by refusing to give Sallie's requested charge that resembled the *Allen* charge given to deadlocked juries. The trial court's charge on kidnapping with bodily injury, taken as a whole, adequately charged the jury on the elements of the offense as alleged by the State, including the definition of "bodily injury."[31] The trial court properly charged the jury that it had to find each element of the crimes charged in the indictment beyond a reasonable doubt in order to render a guilty verdict.

(b) *The penalty phase.* The trial court did not commit reversible error by not charging that a finding of a statutory aggravating circumstance must be unanimous since it did charge that the jury's verdict as to sentence must be unanimous.[32] The trial court was also not required to charge the jury in the penalty phase that non-statutory aggravating circumstances can only be considered if proven beyond a reasonable doubt or that mitigating circumstances need not be unanimously found because the trial court properly charged the jury that they could return a life sentence for any reason or no reason.[33]

10. Sallie. claims that the trial court erred by allowing the State to introduce victim-impact evidence in the guilt-innocence phase. However, the testimony in question was not victim-impact evidence; instead, it was Linda and Justin Moore's account of their ordeal extricating themselves from the bed rail and seeking a neighbor's

[26] See *Potts v. State*, 259 Ga. 812 (1) (388 SE2d 678) (1990).

[27] See *City of Cleburne v. Cleburne Living Center*, 473 U. S. 432, 445-446 (105 SC 3249, 87 LE2d 313) (1985); *Jones v. State*, 249 Ga. App. 327 (2) (548 SE2d 75) (2001).

[28] *United States v. Harris*, 197 F3d 870, 875 (7th Cir. 1999).

[29] See OCGA § 15-12-1 (a) (1) (a person may be excused from jury service if he or she shows good cause, which may include physical disability).

[30] Id.

[31] See *Green v. State*, 193 Ga. App. 894 (1) (389 SE2d 358) (1989); *Roberts v. State*, 158 Ga. App. 309 (1) (279 SE2d 753) (1981).

[32] *Wilson v. State*, 271 Ga. 811 (12) (525 SE2d 339) (1999).

[33] See *Lucas v. State*, 274 Ga. 640 (19) (c) (555 SE2d 440) (2001); *Lance*, supra at 25 (33).

help and their fears that Sallie would return during that time. " ' "Acts and circumstances forming a part or continuation of the main transaction are admissible as res gestae." (Cits.)' [Cit.]"[34] Thus, this evidence was relevant and properly admissible. We also find no prosecutorial misconduct in the prosecutor's misstatement in his opening statement of one of Sallie's comments to the victims during the crimes.

11. The prior difficulties between Sallie and his wife and father-in-law were admissible to show Sallie's bent of mind and motive.[35] The State was not required to provide pretrial notice of this evidence and the trial court gave a proper instruction to the jury on its limited use.[36]

12. The Bacon County grand jury indicted Sallie in 1990 for the murder and other crimes. He was tried and convicted the following year of all the charges, except for acquittals on armed robbery and theft by taking. This Court reversed his convictions in 1998, and the case was returned to Bacon County. In 2000, the State sought and received an order of nolle prosequi on the indictment. The Bacon County grand jury re-indicted Sallie on the offenses other than theft by taking and armed robbery less than six months later. Sallie claims that the State was required to charge in the second indictment exceptions to the statute of limitation for all the charges other than murder because it had been over seven years since the commission of those crimes.[37] He filed a motion to quash the indictment, which the trial court denied. We find no error. The State did not need to allege an exception to the statute of limitation for any of the charged crimes other than murder since Sallie was prosecuted within the applicable statute of limitation for all the charged offenses. OCGA § 17-3-3 specifies that the statute of limitation is extended six months if an indictment brought within the statute of limitation is later nolle prossed.[38] In other words, the State may re-indict a defendant within six months after the first indictment is nolle prossed without running afoul of the statute of limitation even if the initial statute of limitation period has run.[39] Therefore, OCGA § 17-3-3 provides an extension of the statute of limitation period and not an exception to it that

---

[34] *Johnson v. State*, 264 Ga. 456, 458 (2) (448 SE2d 177) (1994), quoting *Shouse v. State*, 231 Ga. 716 (8) (203 SE2d 537) (1974). See also *Presnell v. State*, 274 Ga. 246 (16) (551 SE2d 723) (2001).

[35] See *Wall v. State*, 269 Ga. 506 (2) (500 SE2d 904) (1998).

[36] Id.

[37] See *Moss v. State*, 220 Ga. App. 150 (469 SE2d 325) (1996); OCGA §§ 17-3-1 (b), (c); 17-3-2.

[38] See *Kyles v. State*, 254 Ga. 49, 50-51 (326 SE2d 216) (1985); *State v. Davis*, 201 Ga. App. 533, 534 (411 SE2d 555) (1991).

[39] Id.

must be pled in the indictment. The indictment was not improper.

13. Sallie was charged with malice murder and felony murder predicated on aggravated assault. At trial, he requested, as a "lesser related" charge, a felony murder charge predicated on burglary. The trial court properly denied this requested charge. An additional felony murder charge predicated on burglary cannot be construed as a lesser-included offense of felony murder predicated on aggravated assault or of malice murder.[40] Moreover, since the jury returned a verdict specifying that it found Sallie guilty of malice murder and felony murder, Sallie could not have been harmed by the failure to charge an additional felony murder count.

14. Sallie complains that some of the grand jurors who indicted him had heard about his previous trial and convictions. However, " 'a person is not disqualified or incompetent to serve as a grand juror by reason of bias or prejudice on his part, by the fact that he has heard or read about the case under investigation or has even formed or expressed an opinion as to the guilt of the accused[.]' [Cit.]"[41] A grand jury "is purely an accusatory body."[42] Even if there was some error in the grand jury proceedings, the trial jury's verdict of guilt beyond a reasonable doubt demonstrates that there was probable cause to charge the defendant.[43] Therefore, any possible error was harmless.

15. The searches of Sallie's mobile home and automobile pursuant to separate search warrants were proper and the seized evidence presented at trial was admissible. The search warrants were valid and supported by probable cause.[44] The police did not exceed the scope of the warrant during their search of the mobile home and the warrant did not authorize a "general search."[45]

16. Sallie claims that the trial court erred by refusing to grant his motion to dismiss the statutory aggravating circumstance based on his commission of a burglary.[46] We find no error. The evidence was sufficient to prove that Sallie lacked authority to enter the Moores' house and that he intended to commit the specified felonies once inside.[47] Sallie's argument that he had authority to enter due to his marriage to Robin is, under the circumstances, not supported by the law.[48]

---

[40] See OCGA § 16-1-6; *Henry v. State*, 265 Ga. 732 (6) (462 SE2d 737) (1995).

[41] *Isaacs v. State*, 259 Ga. 717, 719 (2) (a) (386 SE2d 316) (1989).

[42] *Creamer v. State*, 150 Ga. App. 458, 461 (1) (258 SE2d 212) (1979).

[43] See *Isaacs*, supra at 720 (2) (b).

[44] See *Lance*, supra at 20-22 (19) (b); *DeYoung v. State*, 268 Ga. 780 (7) (493 SE2d 157) (1997).

[45] See *Lance*, supra.

[46] OCGA § 17-10-30 (b) (2).

[47] *Jackson v. Virginia*, supra. See also *Morrow*, 272 Ga. at 702 (12); OCGA § 16-7-1 (a).

[48] See *State v. Kennedy*, 266 Ga. 195 (467 SE2d 493) (1996).

17. Count 4 of the indictment alleged that Sallie made "an assault upon the person of Linda Kay Moore with a pistol, a deadly weapon, by shooting said Linda Kay Moore with said pistol[.]" This language is sufficient to charge the elements of aggravated assault and the trial court properly denied Sallie's motion to dismiss this count of the indictment.[49]

18. Sallie claims that the trial court should have dismissed the two statutory aggravating circumstances that involved his commission of the murder while engaged in the commission of the kidnappings with bodily injury of Robin and April. He alleges that the kidnappings with bodily injury occurred after the murder, and that the "bodily injury" elements, the rapes, occurred several hours after the murder. The OCGA § 17-10-30 (b) (2) aggravating circumstance does not require simultaneity of action between the murder and the other capital felony or aggravated battery.[50] Sallie committed the murder and the kidnappings with bodily injury " 'in a relatively short period of time in what can be fairly viewed as one continuous course of criminal conduct. . . .' [Cit.]"[51] In addition, the crimes were part of the same overall plan and the murder of John Moore helped Sallie effectuate the kidnappings of his daughters.[52] OCGA § 17-10-30 (b) (2) does not require that the murder victim and the kidnapping with bodily injury victim be the same person.[53] The trial court did not err by refusing to dismiss these aggravating circumstances.

19. Sallie argues that the trial court erred by improperly limiting his cross-examination of Robin Moore. When Sallie was holding Robin and April against their will at the Liberty County mobile home, he recorded an audiotape with Robin wherein he reminisced about their marriage and Ryan's infancy and made statements that could be construed as regretful for the violent actions he had taken. He also wrote several notes expressing similar sentiments. When he dropped off Robin and April in Bacon County that night, he left the notes and audiotape with them. During the guilt-innocence phase, Sallie sought to cross-examine Robin about his creation of this tape and the notes to counteract some of the damaging statements he had uttered during the crimes. The State objected and the trial court ruled that Sallie could question Robin about the substance of any statements made by him to her in the mobile home, but he could not elicit that he had recorded or written these statements. Sallie was

---

[49] OCGA § 16-5-21 (a); *Smith v. Hardrick*, 266 Ga. 54 (2) (464 SE2d 198) (1995); *Wallace v. State*, 216 Ga. App. 718 (1) (455 SE2d 615) (1995).

[50] See *Romine v. State*, 251 Ga. 208 (8) (305 SE2d 93) (1983); *Strickland v. State*, 247 Ga. 219, 230-231 (275 SE2d 29) (1981); *Peek v. State*, 239 Ga. 422, 431 (238 SE2d 12) (1977).

[51] *Romine*, supra.

[52] See *Strickland*, supra at 231.

[53] See *Peek*, supra; *Tharpe v. State*, 262 Ga. 110 (22) (416 SE2d 78) (1992).

provided the opportunity to admit into evidence the tape and the notes during his cross-examination of Robin, but he refused because he did not want to lose his right to open and close final arguments.[54] Sallie did refresh Robin's memory with a transcript of the tape before questioning her about some of his statements. We conclude that the trial court did not err with regard to the scope of Robin Moore's cross-examination. Sallie was fully permitted to cross-examine Robin about the substance of statements said to her or written by Sallie (and thus possibly said to her) in the mobile home; he was only prevented from eliciting that they had been memorialized.[55] There was also no misconduct by the prosecutor or the witness; Robin clarified that any apology at the mobile home was not made to her. Sallie did tender the audiotape and the notes into evidence in the sentencing phase.

20. In December 1989, John Moore went to the Bacon County courthouse to inquire about his daughter's divorce litigation. When told by the clerk that an order had not yet been signed in the case, John Moore said, "There's going to be a killing before this is over." Even though Sallie was not present when this comment was made and did not know about it before the murder, he sought to admit the statement at trial. Because Sallie did not know about the comment before shooting John Moore, the trial court did not err by excluding it.[56] In addition, not only was this prophetic statement ambiguous as to who would be killed, the evidence overwhelmingly showed that John Moore was lying in bed when he was shot by Sallie.[57]

21. There is no merit to Sallie's contention that African-Americans have been unconstitutionally excluded from serving as Bacon County grand jury foreperson.[58]

22. The verdict form in the penalty phase did not improperly emphasize the statutory aggravating circumstances.[59]

23. Sallie did not object to Linda Moore's identification of a photo of John Moore in life because she was his family member; accordingly, we find no error with its admission.[60]

---

[54] See *Smith v. State*, 272 Ga. 874 (3) (536 SE2d 514) (2000).

[55] See *Duckworth v. State*, 268 Ga. 566 (1) (492 SE2d 201) (1997) (the trial court has discretion to limit the scope of cross-examination). We note that Sallie was not attempting to impeach Robin with her prior statement; instead, he was asking her about his self-serving comments before he released Robin and April. See *Ross v. State*, 268 Ga. 122 (5) (485 SE2d 780) (1997), overruled on other grounds by *Bishop v. State*, 271 Ga. 291 (2) (519 SE2d 206) (1999).

[56] See *Massey v. State*, 272 Ga. 50 (3) (525 SE2d 694) (2000).

[57] See id.

[58] See *King*, 273 Ga. at 259 (2).

[59] See *Cargill v. State*, 255 Ga. 616 (37) (340 SE2d 891) (1986).

[60] See *Garcia v. State*, 267 Ga. 257 (2) (477 SE2d 112) (1996); *Ledford v. State*, 264 Ga. 60 (14) (439 SE2d 917) (1994).

24. The State presented photographs of the murder victim at the crime scene and before autopsy. The photos depicted the location of the body in the bedroom and the nature and extent of the six bullet wounds on the body. Contrary to Sallie's contention, these photos were relevant and admissible.[61]

25. Sallie's death sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor.[62] The death sentence is also not excessive or disproportionate to the penalty imposed in similar cases, considering both the crimes and the defendant.[63] Sallie planned his crimes; armed himself with a gun and handcuffs; broke into his in-laws' house after severing their phone line; shot and killed his father-in-law and wounded his mother-in-law while they lay in bed; handcuffed his bleeding mother-in-law to her nine-year-old son and left them tethered to a bed rail in a room with her dead husband and Sallie's two-year-old son; abducted his estranged wife and her seventeen-year-old sister to a mobile home where he made them take showers while he watched; and then raped them both. The similar cases listed in the Appendix support the imposition of the death penalty in this case, in that all involve a deliberate murder during the commission of a burglary or a kidnapping with bodily injury.

*Judgment affirmed. All the Justices concur.*

APPENDIX.

*Lance v. State*, 275 Ga. 11 (560 SE2d 663) (2002); *Fults v. State*, 274 Ga. 82 (548 SE2d 315) (2001); *Heidler v. State*, 273 Ga. 54 (537 SE2d 44) (2000); *Morrow v. State*, 272 Ga. 691 (532 SE2d 78) (2000); *Gulley v. State*, 271 Ga. 337 (519 SE2d 655) (1999); *Palmer v. State*, 271 Ga. 234 (517 SE2d 502) (1999); *Pruitt v. State*, 270 Ga. 745 (514 SE2d 639) (1999); *Pye v. State*, 269 Ga. 779 (505 SE2d 4) (1998); *Wellons v. State*, 266 Ga. 77 (463 SE2d 868) (1995); *Ledford v. State*, 264 Ga. 60 (439 SE2d 917) (1994); *Fugate v. State*, 263 Ga. 260 (431 SE2d 104) (1993); *Tharpe v. State*, 262 Ga. 110 (416 SE2d 78) (1992); *Lynd v. State*, 262 Ga. 58 (414 SE2d 5) (1992); *Hall v. State*, 259 Ga. 412 (383 SE2d 128) (1989); *Pruitt v. State*, 258 Ga. 583 (373 SE2d 192) (1988); *Cohen v. State*, 257 Ga. 544 (361 SE2d 373) (1987); *Ford v. State*, 257 Ga. 461 (360 SE2d 258) (1987); *Childs v. State*, 257 Ga. 243 (357 SE2d 48) (1987).

---

[61] See *Jackson v. State*, 270 Ga. 494 (8) (512 SE2d 241) (1999); *Jenkins*, 269 Ga. at 293 (20).

[62] OCGA § 17-10-35 (c) (1).

[63] OCGA § 17-10-35 (c) (3).

518

DECIDED MARCH 24, 2003 —
RECONSIDERATION DENIED APRIL 11, 2003.

*Christopher M. Johnson, Palmer C. Singleton III*, for appellant.
*Richard E. Currie, District Attorney, Alexander A. Markowich, Assistant District Attorney, Thurbert E. Baker, Attorney General, Susan V. Boleyn, Senior Assistant Attorney General, Patricia A. Burton, Assistant Attorney General*, for appellee.