**FIRST DIVISION**
**ELLINGTON, C. J.,**
**PHIPPS, P. J., and DILLARD, J.**

NOTICE: Motions for reconsideration must be
*physically received* in our clerk's office within ten
days of the date of decision to be deemed timely filed.
(Court of Appeals Rule 4 (b) and Rule 37 (b), February 21, 2008)
http://www.gaappeals.us/rules/

**May 3, 2012**

# In the Court of Appeals of Georgia

A12A0998. HICKS v. THE STATE.                              JE-038C

ELLINGTON, Chief Judge.

A DeKalb County jury found Darryl Hicks guilty beyond a reasonable doubt of engaging in a pattern of racketeering activity in violation of the Georgia RICO (Racketeer Influenced and Corrupt Organizations) Act[1] and nine counts of violating the Georgia Securities Act of 1973.[2] Following the denial of his motion for a new trial, Hicks appeals, contending that the evidence was insufficient, that the trial court erred in denying his plea in bar and his motion for a mistrial, and that he received ineffective assistance of counsel. For the reasons explained below, we affirm.

---

[1] OCGA §§ 16-14-1 et seq.; 16-14-4 (a).

[2] OCGA §§ 10-5-1 et seq. (2000). Note: Effective July 1, 2009, the Georgia Securities Act of 1973 was repealed in its entirety and replaced with the Georgia Uniform Securities Act of 2008. See Ga. L. 2008, p. 381, §§ 1, 10.

1. Hicks contends that "[t]he evidence was insufficient to show that an investment contract existed as defined and required by the [Securities Act] and that such contract was sold by [him]."

The indictment charged that, in 2000 and 2001, Hicks violated the Securities Act as to three groups of victims and that, as to each group, he violated the same three provisions of the Securities Act. First, the indictment charged that Hicks "unlawfully and willfully offer[ed] for sale and did sell a security, to wit: an investment contract, . . . which security was not subject to an effective registration statement pursuant to OCGA § 10-5-5 (a) (1) - (3) [(2000)]."[3] Second, the indictment charged that Hicks "unlawfully and willfully offer[ed] for sale and did sell a security, to wit: an investment contract, . . . when [he] was not registered as a salesman of securities pursuant to OCGA § 10-5-3 (a) [(2000)]."[4] Third, the indictment alleged that Hicks,

---

[3] OCGA §§ 10-5-5 (a) (2000) ("It shall be unlawful for any person to offer for sale or to sell any securities to any person in this state unless: (1) [t]hey are subject to an effective registration statement under [the Securities Act]; (2) [t]he security or transaction is exempt under [OCGA §] 10-5-8 or [OCGA §] 10-5-9, respectively; or (3) [t]he security is a federal covered security."); 10-5-12 (a) (1) (2000) ("It shall be unlawful for any person: . . . [t]o offer to sell or to sell any security in violation of . . . [OCGA §] 10-5-5[.]").

[4] OCGA §§ 10-5-3 (a) (2000) ("No dealer, limited dealer, salesperson, or limited salesperson, as defined by this chapter, shall offer for sale or sell any securities within or from this state, [subject to specified exceptions], unless he or she is a

2

in connection with an offer to sell and sale of a security engaged "in an act, practice, and course of business that would operate and did operate as a fraud and deceit upon [the victims]."[5] Finally, in ten paragraphs, the indictment charged Hicks with engaging in a pattern of racketeering based on his transactions with the victims.[6]

At trial, the State adduced evidence that showed that Hicks, acting as the president of DNH Enterprises, Inc., met with the victims in 2000, representing himself to be a licensed trader, which he was not. Hicks presented the victims with a booklet of information entitled "Private Banking & Secured Financial Programs" and invited them to participate as investors. Hicks, verbally and in the booklets, described two programs, a bank debenture trading program and a foreign currency trading program. According to Hicks, through his management, the victims' investment would generate

registered dealer, limited dealer, salesperson, or limited salesperson pursuant to this Code section[.]"); 10-5-12 (a) (1) (2000) ("It shall be unlawful for any person . . . [t]o offer to sell or to sell any security in violation of . . . [OCGA §] 10-5-3[.]").

[5] OCGA § 10-5-12 (a) (2) (C) (2000) ("It shall be unlawful for any person[,] [i]n connection with an offer to sell, sale, offer to purchase, or purchase of any security, directly or indirectly[,] . . . [t]o engage in an act, practice, or course of business that operates or would operate as a fraud or deceit upon a person[.]").

[6] OCGA § 16-14-4 (a) "(It is unlawful for any person, through a pattern of racketeering activity or proceeds derived therefrom, to acquire or maintain, directly or indirectly, any interest in or control of any enterprise, real property, or personal property of any nature, including money."). See Division 4, infra.

3

huge returns. For example, one program required the investor to hold $500,000 on deposit for ten weeks and would return to the investor $800,000 gross every week, with a net return (after paying the "Program Manager" or the "Bank Trader" and Hicks' company) after ten weeks of $2.8 million. Hicks encouraged the victims to pool their funds, so that they could satisfy the large minimum amounts supposedly required for participation. The agreement between Hicks and the victims entitled Hicks to 50 percent of the profits as a commission for his help and expertise.

Initially, the victims, at Hicks' direction, opened accounts at SunState FX. After a few months of low returns, however, the victims, again at Hicks' direction, withdrew their funds from SunState FX and transferred the money to him, ostensibly for him to hold for a few months until the next debenture program opened up. About the time the victims were supposed to start receiving returns on their investment, Hicks stopped communicating with them and left the country. The victims did not receive the promised return of their initial investment or any profits.

In challenging the sufficiency of the evidence, Hicks contends that the booklets that he prepared and distributed to the victims "are the only documents that refer to an investment and they do not meet the requirements for a security under Georgia law[,]" and, therefore, "[t]he evidence was insufficient to show that a contract or

security existed that [met] the requirements of OCGA §10-5-2 [(a)] (26) and (31) [(2000)]." In addition, he contends that there was no evidence that he kept any of the victims' money for his personal use and, therefore, that there was no evidence that he sold any securities. These arguments lack merit.

In addition to stocks and bonds, the Securities Act defined "security" to include a great variety of investment vehicles and arrangements, including any "investment contract[.]" OCGA § 10-5-2 (a) (26) (2000). The term investment contract, however, is not comprehensively defined in the Securities Act.[7] In applying the Securities Act, the Supreme Court of Georgia adopted the definition that pertains to federal securities laws, originally articulated in *Securities & Exchange Comm. v. W. J. Howey Co.*, 328 U. S. 293 (66 SC 1100, 90 LE 1244) (1946). See *Dunwoody Country Club &c. v.*

---

[7] Under the Securities Act,
[t]he term "investment contract" shall include *but is not limited to* an investment which holds out the possibility of return on risk capital even though the investor's efforts are necessary to receive such return if:
　　(A) Such return is dependent upon essential managerial or sales efforts of the issuer or its affiliates; and
　　(B) One of the inducements to invest is the promise of promotional or sales efforts of the issuer or its affiliates in the investor's behalf; and
　　(C) The investor shall thereby acquire the right to earn a commission or other compensation from sales of rights to sell goods, services, or other investment contracts of the issuer or its affiliates.
OCGA § 10-5-2 (a) (26) (2000) (Emphasis supplied.)

*Fortson*, 243 Ga. 236, 238-239 (253 SE2d 700) (1979); *Ga. Market Centers v. Fortson*, 225 Ga. 854, 858 (171 SE2d 620) (1969). The *Howey* test "for whether a particular scheme is an investment contract . . . look[s] to whether the scheme involves [(1)] an investment of money [(2)] in a common enterprise [(3)] with [an expectation of] profits to come solely from the efforts of others." (Citation and punctuation omitted.) *Securities & Exchange Comm. v. Edwards*, 540 U. S. 389, 393 (II) (124 SC 892, 157 LE2d 813) (2004).

> The [United States] Supreme Court has long espoused a broad construction of what constitutes an investment contract, aspiring to afford the investing public a full measure of protection. The investment contract taxonomy thus embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits.

(Citations and punctuation omitted.) *Securities & Exchange Comm. v. SG Ltd.*, 265 F3d 42, 47 (II) (A) (1st Cir. 2001). See also *United Housing Foundation v. Forman*, 421 U. S. 837, 852 (II) (B) (95 SC 2051, 44 LE2d 621) (1975) ("The touchstone [of a security] is the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others."). In addition, an investment scheme may constitute an investment

6

contract, even when the purported instrument does not in fact exist, as is often the case with investment fraud. See *Local 875 &c. v. Pollack*, 992 FSupp. 545, 564 (II) (C) (E.D. N.Y. 1998) (The fact that the prime bank note that the defendants purported to sell to investors "existed nowhere but in the minds of the defendants [did] not remove th[e] case from the purview of [the federal Securities Exchange Act of 1934, 15 USC § 78j (b), and Rule 10b-5 promulgated thereunder, 17 CFR § 240.10b-5]. A fraud in connection with the purchase or sale of a fraudulent security is no less actionable for its fictitious quality.") (footnote omitted).

Here, the evidence authorized the jury to find that all three prongs of the *Howey* test were satisfied. First, the victims parted with their money in anticipation of investment gains. Second, there was a common enterprise, because the victims' funds were pooled to reach the minimum amounts for participation set by Hicks. Third, the expectation of profits rested solely on the efforts of others (the "Program Manager" or "Bank Trader"). See *Securities & Exchange Comm. v. SG Ltd.*, 265 F3d at 48-55 (III). In addition, the evidence authorized the jury to find that Hicks acted as a dealer or salesperson who would receive a percentage of the returns as a commission. Consequently, Hicks' sufficiency challenge fails.

7

2. Hicks contends that the State failed to obtain a valid indictment within the statute of limitation and, therefore, that the trial court erred in denying his plea in bar.

The record shows that none of the victims were aware of Hicks' fraud before April 19, 2001. A grand jury returned an indictment on April 14, 2005, within the applicable statute of limitation, which charged Hicks with one RICO count and nine counts of violating the Securities Act.[8] On November 30, 2007, the trial court granted the State's request to enter a nolle prosequi order. On December 17, 2007, the grand jury returned a second indictment, charging Hicks with the same ten counts.

Under Georgia law, if the State obtains an indictment within the time allowed, and a nolle prosequi is later entered as to the first indictment, the State may re-indict the defendant within six months after the entry of nolle prosequi, regardless of the intervening expiration of the initial limitation period. *Carlisle v. State*, 277 Ga. 99, 100-101 (586 SE2d 240) (2003); *Sallie v. State*, 276 Ga. 506, 513-514 (12) (578 SE2d

---

[8] See OCGA § 17-3-1 (c) (Unless otherwise specified, "[p]rosecution for felonies . . . must be commenced within four years after the commission of the crime[.]"); *State v. Bair*, 303 Ga. App. 183, 185 (692 SE2d 806) (2010) ("The four-year limitation period does not include any period in which the crimes were unknown by the State, [although] the knowledge of someone injured by the crime may be imputed to the State for purposes of determining if the exception to the statute applies.").

444) (2003).[9] Because the State re-indicted Hicks within six months of the entry of the nolle prosequi, the trial court did not err in denying his plea in bar. *Alexander v. State*, 192 Ga. App. 211, 212 (384 SE2d 436) (1989).

3. Hicks contends that his trial counsel rendered ineffective assistance by consenting to the State's nolle prosequi rather than insisting that the trial court rule on his special demurrer.

> In order to prevail on a claim of ineffective assistance of counsel, a criminal defendant must show that counsel's performance was deficient and that the deficient performance so prejudiced the client that there is a reasonable likelihood that, but for counsel's errors, the outcome of the trial would have been different. *Strickland v. Washington*, 466 U. S. 668 (104 SC 2052, 80 LE2d 674) (1984)[.] The criminal defendant must overcome the strong presumption that trial counsel's conduct falls within the broad range of reasonable professional conduct.

(Citations and punctuation omitted.) *Robinson v. State*, 277 Ga. 75, 75-76 (586 SE2d 313) (2003). See also *Miller v. State*, 285 Ga. 285, 286 (676 SE2d 173) (2009) (In analyzing the prejudice element, "[t]he question is whether there is a reasonable

---

[9] See OCGA § 17-3-3 ("If an indictment is found within the time [allowed by law], and is quashed or a nolle prosequi entered, the limitation shall be extended six months from the time the first indictment is quashed or the nolle prosequi entered.").

9

probability that, absent [counsel's] errors, the factfinder would have had a reasonable doubt respecting guilt.") (citation and punctuation omitted). Failure to satisfy either prong of the *Strickland v. Washington* standard is fatal to an ineffective assistance claim. *Goodwin v. Cruz-Padillo*, 265 Ga. 614, 615 (458 SE2d 623) (1995); *Ponder v. State*, 201 Ga. App. 388, 389 (1) (411 SE2d 119) (1991). As the appellate court, "[w]e accept the trial court's factual findings and credibility determinations unless clearly erroneous, but we independently apply the legal principles to the facts." (Citation and punctuation omitted.) *Robinson v. State*, 277 Ga. at 76.

Hicks contends that, "[if] the trial court [had] quashed the [first] indictment instead of executing a nolle prosequi, [OCGA] § 17-3-3 would not have been triggered[,] and the [s]tatute of [l]imitation[ ] on all counts would have expired." This is incorrect. By its plain terms, the savings provision of OCGA § 17-3-3 applies when a timely indictment is quashed, as well as when a nolle prosequi is entered. Because the State could have tried Hicks on the second indictment even if the trial court had quashed the first indictment, see Division 2, supra, Hicks failed to carry his burden under *Strickland v. Washington*. *Hall v. State*, 292 Ga. App. 544, 552-553 (6) (a) (664 SE2d 882) (2008); see also *Davis v. State*, 267 Ga. App. 245, 246 (2) (599 SE2d 237)

(2004) ("Failure to pursue a futile motion does not constitute ineffective assistance.") (citation and punctuation omitted).

4. Hicks contends that the trial court erred by failing to grant his motion for a mistrial, which was based on allegedly improper character evidence. "[W]hether to grant a mistrial is a matter within the discretion of the trial court, and that discretion will not be interfered with on appeal unless it is apparent that a mistrial is essential to the preservation of the right to a fair trial." (Citation and punctuation omitted.) *Jones v. State*, 277 Ga. 36, 40 (6) (586 SE2d 224) (2003).

The record shows that, at the beginning of jury selection, the prosecutor read the indictment to the venire; the RICO count listed thirteen predicate acts. The trial court then instructed the potential jurors not to consider the charges as evidence. When the State rested its case, it had been unable to bring forward a prosecution witness as to three of the listed predicate acts, and Hicks moved for a directed verdict and for a mistrial based on the introduction of improper character evidence. The trial court granted the motion for a directed verdict in part, ordering that, for its deliberations, the jury would receive a copy of the indictment with the three paragraphs in question redacted. The court denied the motion for a mistrial. Hicks contends that, because it is only necessary to prove two predicate offenses to establish

11

a RICO violation,[10] the State improperly placed his character in evidence by including three predicate acts it could not prove, in addition to the ten predicate acts it did prove, which suggested to the jury that he was "guilty because of the large number of allegations." As a result, Hicks contends, he was entitled to a mistrial.

Hicks failed to identify any authority, however, for the premise that a criminal defendant is entitled to a mistrial solely on the basis that, at the beginning of jury selection, the venire heard allegations as to which a directed verdict was later granted. Because the allegations of the indictment did not constitute evidence, as the jury was repeatedly and thoroughly instructed, Hicks' character was not improperly placed in issue. See *Robinson v. State*, 312 Ga. App. 736, 746-747 (4) (b) (719 SE2d 601) (2011) (Where the trial court instructed the jury that it was not to consider the indictment as evidence in the case, the court's reading of a portion of the indictment containing "unproven and unsubstantiated allegations" did not constitute an improper introduction of character evidence.). There was no abuse of discretion.

5. Hicks contends that he received ineffective assistance of counsel in that, after the trial court denied his motion for a mistrial, his trial counsel failed to request a

---

[10] See *Bethune v. State*, 198 Ga. App. 490, 491 (1) (402 SE2d 276) (1991) ("The State is not required . . . to prove all the predicate offenses alleged in the indictment, but is required to prove only two beyond a reasonable doubt.") (citation omitted).

curative instruction directing the jurors to consider only the predicate offenses currently before them. As we noted in Division 4, supra, the trial court repeatedly and thoroughly instructed the jury not to consider the allegations of the indictment as evidence. Consequently, Hicks failed to show any prejudice from counsel's failure to request such an instruction. *Dockery v. State*, 287 Ga. 275, 278-279 (5) (d) (695 SE2d 599) (2010); *Greenwood v. State*, 309 Ga. App. 893, 895-896 (1) (c) (714 SE2d 602) (2011).

*Judgment affirmed. Phipps, P. J., and Dillard, J., concur.*