OPINION OF THE COURT
Rosalyn H. Richter, J.
This decision supplements an oral ruling permitting a juror *191 with a visual impairment to continue serving on the jury. The vision problem of the juror, who will be referred to as Ms. B., was not discovered until the second day of trial. At that time, Ms. B. disclosed that she had a detached retina in one eye and had limited vision in her other eye. As a result, Ms. B. explained that from her assigned seat in the jury box she could see only the outline of the witnesses’ faces, but could not see all the details of their facial expressions. She explained that her vision problem also made it difficult, if not impossible, for her to read standard size print. However, she did have special reading glasses which made it easier for her to read enlarged print. Since Ms. B. had already been sworn as a member of the jury, the question was whether her eye problem rendered her unfit for continued service. This court found that Ms. B.’s vision limitation did not render her automatically unqualified for the jury and that the court had an obligation to "reasonably accommodate” her pursuant to the Americans with Disabilities Act of 1990 (ADA). (42 USC § 12101 et seq., added by Pub L 101-336.)
As a government entity, the court system is required pursuant to section 202 of the ADA (42 USC § 12132) to make all of its services, programs and activities available to "qualified individuals]” with disabilities. Although there are no decisions in this State explicitly extending this section to the jury selection process, several Federal court cases have held that the automatic exclusion of a person with a disability from jury duty would violate both the ADA and section 504 of the Rehabilitation Act of 1973 (29 USC § 794, added by Pub L 93-112). (See, Galloway v Superior Ct., 816 F Supp 12 [DC 1993]; DeLong v Brumbaush, 703 F Supp 399 [WD Pa 1989]; see also, People v Green, 148 Misc 2d 666, 670 [Westchester County Ct 1990] [decision discusses ADA which had been signed, but had not come into effect]). Thus, Ms. B., who had already been found to have the qualifications necessary to serve as a juror, could not be removed from the jury simply because she had a disability.
Section 201 of the ADA defines a " 'qualified individual with a disability’ ” as "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.” (42 USC § 12131.) Based on *192 this language, this court found that Ms. B. could not be considered unqualified unless she could not, with reasonable modifications, fulfill the functions of a juror in this case. Here, Ms. B. required only minimal assistance to follow the evidence in the case. Ms. B. was moved from her seat in the middle of the jury box to the first seat, which was closer to the witness box.[1] All of the documents introduced into evidence were read into the record by the court so that Ms. B. would not be at a disadvantage because of her reading difficulties. In addition, as it was reading the orders of protection, the court gave a brief description of the general layout of the orders so that Ms. B. would have some sense of how the words appeared on the documents. Finally, an enlarged print version of a transcript was given to Ms. B. so that she would be able to use the transcript as an aid to listening to an audiotape, which was introduced into evidence at trial.
Ms. B.’s participation in this case did not deny the defendant due process. In People v Guzman (76 NY2d 1, 5 [1990]), the Court of Appeals held that a hearing-impaired person was not disqualified from jury duty provided that the person could "understand all of the evidence presented, evaluate that evidence in a rational manner, communicate effectively with the other jurors during deliberations, and comprehend the applicable legal principles, as instructed by the court.” (See, Judiciary Law § 510 [3].) No question exists about Ms. B.’s mental ability to understand the evidence or about her verbal communication skills. The sole question is whether her inability to observe the witnesses’ facial expressions prevented her from fairly evaluating the testimony.
As the Court of Appeals noted in Guzman (supra), each juror brings to the deliberation process his or her own background and experience. Thus, the Court in Guzman held that a hearing-impaired juror should not be disqualified because that individual could not determine credibility based on the witness’ tone and delivery. (See also, United States v Dempsey, 830 F2d 1084 [10th Cir 1987] [upholding seating of deaf juror].) Similarly, it would have been inappropriate to disqualify Ms. B. simply because she could not see the witnesses’ facial expressions or their body language. (People v Pagan, 191 AD2d *193 651 [2d Dept 1993].) In her everyday life, Ms. B. has to make judgments and credibility determinations without relying on visual clues and there is simply no reason to believe that she was incapable of using those same skills to reach a decision in this case. In fact, the concept that credibility determinations may be made in a variety of ways is incorporated in the standard jury instructions, which provide a long list of factors besides demeanor to be used in evaluating a witness’ testimony. (See, 1 CJI[NY] 7.02, at 265.)
The decision in Jones v New York City Tr. Auth. (126 Misc 2d 585 [Civ Ct, NY County 1984]) can be distinguished from the instant case. In Jones, the court concluded that the prospective juror who was blind should not be permitted to serve because there would be a significant amount of physical evidence. Here, however, no physical evidence was presented. Rather, the case primarily involved credibility determinations based on conflicting accounts from witnesses, whose testimony Ms. B. was able to hear at trial. The jury also had to listen to a number of tape recordings, all of which Ms. B. could evaluate in the same manner as the other jurors. There were only a limited number of documents, all of which the court read into the record.[2]
The court was not obligated to disqualify Ms. B. merely because the defense introduced some photographs at trial. The pictures involved a collateral issue and thus it was not absolutely necessary that Ms. B. see them for herself. (Compare, People v Brown, 62 NY2d 743 [1984] [blind Judge could not preside at suppression hearing where lineup photograph was crucial piece of evidence], and People v Johnson, 134 AD2d 617 [2d Dept 1987] [blind Judge could preside at pretrial hearing which did not involve visual inspection of any exhibits]; see also, Commonwealth v Susi, 394 Mass 784, 477 NE2d 995 [1985] [blind juror could not sit on case where composite drawings were used and where eyewitness identification was critical issue].) The photographs, which purportedly showed bruises on the defendant’s face, were presented because they allegedly corroborated the defendant’s testimony that the complainant had assaulted her on an uncharged date. The defense claimed that the complainant and another prosecution witness, who was involved with the complainant, had fabri *194 cated their testimony about the charged offenses, in part, to cover up the assault of the defendant on this uncharged date. The defense argued further that the complainant and this other prosecution witness had lied about the alleged attack when they testified at trial.
Although it is likely that Ms. B. could not see the photographs clearly,[3] the court described them to Ms. B. when they were introduced into evidence. In addition, Ms. B. was aware of the defense claim about the assault since she heard the trial testimony on this issue. Furthermore, the allegations about the assault were simply one of many defense arguments as to why the prosecution’s witnesses should not be believed. Indeed, the defendant testified in great detail about the many indignities, slights and abuses which she claimed the prosecution witnesses had committed against her during the years covered by the charges. Thus, even without the photograph, Ms. B. had sufficient information to enable her to evaluate the plausibility of the witnesses’ testimony, which is perhaps the most essential function of a juror.
It is difficult to imagine a trial in which absolutely no documents, diagrams, police reports, photographs or physical evidence are introduced. If this court were to hold that Ms. B. was disqualified simply because a few documents and a few photographs are presented, it would, in effect, be concluding that there were almost no cases on which visually-impaired or blind jurors could sit. Such a ruling would violate the spirit and intent of the ADA and of the Rehabilitation Act of 1973. Rather, the question is whether the court could accommodate the juror by verbally describing the evidence or by any other means, and whether the evidence is so crucial that the juror’s inability to see it denied the defendant a fair trial. (See, United States v Dempsey, 830 F2d, at 1087-1088, supra; People v Guzman, 76 NY2d, at 5, supra.) In this case, the court finds that the defendant was not denied due process and adheres to its oral ruling permitting Ms. B. to sit on the jury.

. Ms. B.’s position was changed with the consent of both counsel. She was permitted to sit in seat number one only during the testimony of the witnesses, but retained her position in the jury for all other purposes. Thus, the individual who had originally been chosen as juror number one remained as the foreperson.

. The Jones case (supra) did not discuss whether it would have been possible to accommodate the blind juror by giving a verbal description of the physical evidence. In fact, it is unclear from the decision what type of physical evidence was involved.

. Ms. B. used her special reading glasses to see the photographs. Thus, she may have been able to see at least some of the picture.