Danny Trotman v. State of Maryland, No. 8, September Term, 2019

**PROSPECTIVE JURORS WITH DISABILITIES – AMERICANS WITH DISABILITIES ACT – MD. CODE ANN., CTS. & JUD. PROC. (1974, 2013 REPL. VOL., 2016 SUPP.) §§ 8-102(b) AND 8-103(b)(3) –** Court of Appeals held that, under Americans with Disabilities Act, Maryland statutes that govern jury service, and relevant case law, trial court may not summarily excuse prospective jurors with disabilities. Instead, trial court may excuse prospective juror for cause on disability-related ground if no reasonable accommodation is possible, and, at that particular trial, particular disability would prevent prospective juror from providing satisfactory jury service. Court of Appeals held that, where staircase with twenty-five steps was only way to reach jury room that accompanied courtroom that was used for trial, and trial court concluded no other courtroom was available, trial court did not abuse its discretion in excusing for cause four prospective jurors who indicated that they would be unable to use stairs.

Circuit Court for Baltimore City
Case No. 115236022

Argued: September 9, 2019

IN THE COURT OF APPEALS

OF MARYLAND

No. 8

September Term, 2019
_____

DANNY TROTMAN

v.

STATE OF MARYLAND
_____

Barbera, C.J.
McDonald
Watts
Hotten
Getty
Booth
Adkins, Sally D. (Senior Judge,
Specially Assigned),

JJ.
_____

Opinion by Watts, J.
_____

Filed: October 18, 2019

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

It is well-established that having the opportunity to participate in jury service is both a right and a responsibility. As Md. Code Ann., Cts. & Jud. Proc. (1974, 2013 Repl. Vol., 2016 Supp.) ("CJ") § 8-102(a) states, "[e]ach adult citizen of this State has: (1) The opportunity for jury service; and (2) When summoned for jury service, the duty to serve." (Paragraph breaks omitted).

It is equally well-established that "[a] citizen may not be excluded from jury service due to color, **disability**, economic status, national origin, race, religion, or sex." CJ § 8-102(b) (emphasis added). Under the Americans with Disabilities Act, 42 U.S.C. §§ 12101 to 12213, generally, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in . . . the . . . activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. And, CJ § 8-103(b)(3) states in pertinent part: "[S]ubject to the federal Americans with Disabilities Act, an individual is not qualified for jury service if the individual . . . [h]as a disability that, as documented by a health care provider's certification, prevents the individual from providing satisfactory jury service[.]" "The [Maryland] Judiciary is committed to complying with the Americans with Disabilities Act, including through providing prospective jurors with an equal opportunity to participate in jury service." Maryland Judiciary, Jury Service: Notice: [Americans with Disabilities Act] Compliance, https://www.mdcourts.gov/juryservice/noticeada [https://perma.cc/TJY2-LWEZ].

This case involves the unfortunate circumstance that in a courthouse in the Circuit Court for Baltimore City a staircase with twenty-five steps was the only way to reach the jury room that accompanied the courtroom that was used for the trial in this case. We must

decide whether the trial court abused its discretion in excusing for cause four prospective jurors who said that they would have difficulty using[1] or were unable to use stairs.

The State, Respondent, charged Sergeant Danny Trotman, Petitioner, a correctional officer of the Department of Public Safety and Correctional Services, with second-degree assault, conspiracy to commit second-degree assault, and misconduct in office. At the start of trial, before the jury panel entered the courtroom, four prospective jurors disclosed to the Jury Commissioner's Office that they would either have difficulty using or be unable to use stairs, and the Jury Commissioner's Office gave that information to the circuit court. The circuit court separately called each of the four prospective jurors to the bench. In each instance, first, the circuit court expressly confirmed that the prospective juror was unable to use stairs; then, the circuit court informed the prospective juror that a staircase with twenty-five steps was the only way to reach the jury room. Ultimately, the circuit court excused the four prospective jurors for cause and directed them to return to the jury assembly room to be available for participation as jurors in another trial. Trotman's counsel objected to the circuit court excusing the four prospective jurors for cause and requested that the circuit court conduct the trial in another courtroom. The circuit court responded that no other courtroom was available, and trial proceeded in the assigned

---

[1]In response to questions from the circuit court during *voir dire* as to whether the jurors could use the stairs to the jury room, one prospective juror, Juror 376, indicated that she had "difficulty doing stairs"; a second prospective juror, Juror 408, responded that she had a "hard time going across the street"; and two other prospective jurors expressly said that they would not be able to use the stairs. No issue has been raised as to whether the circuit court was correct in determining that the four prospective jurors could not use the stairs to the jury room.

courtroom. The jury found Trotman guilty of two charges. Trotman appealed, and the Court of Special Appeals affirmed. Trotman filed a petition for a writ of *certiorari*, which this Court granted.

Before us, Trotman contends that the circuit court erred in excusing for cause the four prospective jurors who indicated that they were unable to use stairs. Trotman argues that the circuit court failed to properly exercise its discretion to excuse for cause the four prospective jurors at issue, as it failed to consider potential options for accommodating them. The State responds that, although prospective jurors with disabilities cannot be excluded from jury service across the board, on a case-by-case basis, a trial court may excuse a prospective juror with a disability if the disability would interfere with the performance of the prospective juror's duties.

Guided by the Americans with Disabilities Act, Maryland statutes that govern jury service, and relevant case law, we hold that a trial court may not summarily excuse for cause prospective jurors with disabilities; instead, a trial court may excuse a prospective juror for cause on a disability-related ground if no reasonable accommodation is possible, and, at that particular trial, the particular disability would prevent the prospective juror from providing satisfactory jury service. Applying our holding to this case's circumstances, we conclude that the circuit court did not abuse its discretion in excusing for cause the four prospective jurors who indicated they would be unable to use the stairs to the jury room.

# BACKGROUND

## Jury Selection

On the first day of trial, shortly after the jury panel entered the courtroom, during a

bench conference, the circuit court stated:

> [Juror 376[2]] is unable to use stairs. So she can't be on this jury because there
> are [twenty-five step]s to the jury room. So I'm going to strike her for cause.
> . . . [M]aybe I [had] better check with these [prospective jurors] to make sure
> [that] they're telling the truth. . . . [Juror] 408 also says [that s]he can't do
> stairs. . . . I'm not going to strike. I'm going to talk to them. . . . [Juror] 624
> also says [that] she can't do stairs.

After the circuit court called roll, the following exchanges occurred:

THE COURT: May I see Juror [] 376 at the bench with [c]ounsel?

* * *

THE COURT: [Juror 376], I understand from the Jury Commissioner's
Office that you have difficulty doing stairs, is that correct?

[JUROR 376]: Yes.

THE COURT: There are [twenty-five] steps to the jury room, so I'm going
to excuse you from serving on this jury because you're unable to do the stairs.
Okay?

[JUROR 376]: Okay.

THE COURT: So you should go back to the jury assembly room now.

[JUROR 376]: Okay. Now, in the future, I don't feel that I -- I have the
ability to -- I know that you don't want to discriminate against me --

THE COURT: Correct.

[JUROR 376]: But I feel that[,] in serving on the jury[,] you need to use your

---

[2]Although the transcript reads "(Indiscernible)" here, the context makes clear that
the circuit court said "376," referring to Juror 376.

- 4 -

visual cues as well as, you know, the evidence and everything --

THE COURT: Well, and you would let the [j]udge know that. Not every person who's blind feels that way.

[JUROR 376]: Okay.

THE COURT: But you would just[ --] the [j]udge will always ask you if there's anything else, if there's any other reason why you shouldn't serve as [a] jur[or]. You can tell them that. Okay?

[JUROR 376]: Okay. All right.

THE COURT: You can go back now to [the jury assembly room], where you were at.

[JUROR 376]: Where I was at?

THE COURT: Where you were at.

[JUROR 376]: Thank you.

THE COURT: May I see Juror [] 408[,] please?

* * *

THE COURT: [Juror 408], you told the Jury [Commissioner's] Office that you were unable to do [stair]s. There are [twenty-five] steps to the jury room in this courtroom. Will you be able to do those?

[JUROR 408]: I have hard time going across the street.

THE COURT: No? Okay. Well, for that reason[ --] there are courtrooms that are on the same level, but this is not one of them. So I'm going to excuse you and ask you to go back to the jury assembly room.

[JUROR 408]: Okay. All right. Thank you.

THE COURT: May I see Juror [] 624?

* * *

THE COURT: I understand that you're unable to do steps, is that correct?

- 5 -

[JUROR 624]: Yes.

THE COURT: There's [twenty-five] steps to the jury room in this courtroom, so are you telling me that you don't think you can do [twenty-five] steps?

[JUROR 624]: No. Do you have[ --] is there an elevator? I can do that.

THE COURT: We don't have an elevator. You [would] have to walk up and down the steps. Up and down the steps.

[JUROR 624]: No. No.

THE COURT: So I'm going to excuse you from serving on this jury. All right?

[JUROR 624]: Okay. Thank you.

THE COURT: So you're excused now. They do have courtrooms on the same level, so there are no steps involved.

[JUROR 624]: Okay.

THE COURT: So you may be selected for one of them, so you're free to go back.

[JUROR 624]: Okay. Okay. Thank you.

* * *

THE COURT: May see Juror [] 404?

* * *

THE COURT: [Juror 404], you told the [J]ury [C]ommissioner['s Office] that you couldn't serve on this jury because you couldn't go up and down stairs, is that correct?

[JUROR 404]: Umm --

THE COURT: I've got [twenty-five step]s. Could you go up and down [twenty-five step]s?

[JUROR 404]: No.

THE COURT: Okay. I'm going to excuse you then.

[JUROR 404]: Okay.

THE COURT: You can report back to the [j]ury [a]ssembly [r]oom now.

[JUROR 404]: Thank you.

After the circuit court finished questioning individual prospective jurors about their responses to the *voir dire* questions that the circuit court asked of the jury panel, the following exchange occurred:

> [TROTMAN'S COUNSEL]: I'd like to make motion on the stairs, particularly [Juror 624,[3] who] said that [she] would love to serve if [she] could be accommodated with [] an elevator.
>
> THE COURT: And how would you have suggested [that] I accommodate her?
>
> [TROTMAN'S COUNSEL]: That we go to another courtroom, on behalf of [] Trotman, who's on trial here, for him to have fundamentally fair trial as a [d]efendant[,] versus the need to have steps in particular courtroom[. T]hat's reason they're going to get struck when they're randomly picked [prospective] jurors. That's my objection.
>
> THE COURT: Okay. **Unfortunately[,] in the Baltimore City Circuit Court[,] every single courtroom is being used.** I, as a senior judge,[4] fill up the empty courtroom[,] Judge [Sylvester] Cox's courtroom, which is what we're in. He's assigned to juvenile[. T]hat's why we're here. It's the only

---

[3]Here, Trotman's counsel inadvertently referred to Juror 408.

[4]In this context, "senior judge" means

> an individual who (A) once served as a judge on the District Court, a circuit court, or an appellate court of this State, (B) retired from that office voluntarily or by operation of law by reason of age, and (C) has been approved for recall to sit as a judge[.]

Md. R. 1-202(z)(2).

courtroom that's available.  So you'[v]e made your record.

(Emphasis added).

## State's Witnesses' Trial Testimony, Verdicts, and Sentences

Although the evidence adduced at trial is not dispositive of the issue that is before this Court, we provide a summary of the evidence for completeness. At trial, as a witness for the State, David Gilmore testified that, on December 2, 2014, while he was working as a correctional officer at Baltimore Central Booking & Intake Center, he was told that five inmates needed to be moved.  Gilmore went to the area where the five inmates were, and was told that one of them, Eric Wise, was refusing to move.  Six or seven correctional officers were in the area of Wise's cell.  One of them, a Sergeant Thompson, approached the door to Wise's cell, spoke to him, and then struck him.  According to Gilmore, Wise came "running, crawling out of [his] cell[.]"  Two officers pushed Wise down and told him to get on his stomach.  Wise broke away from the two officers and headed toward an exit. At that point, Trotman, who was standing near the exit, slapped Wise, who turned and went in a different direction.  Sergeant Thomas struck Wise's back, and Wise got on his stomach and was handcuffed.

As a witness for the State, Wise testified that, on December 2, 2014, while he was an inmate at Baltimore Central Booking & Intake Center, he was told that he needed to be moved.  When Wise asked why, Sergeant Thomas hit him.  Other correctional officers entered Wise's cell.  Wise tried to run, and some of the correctional officers tried to hold him down.  Wise pulled away from the correctional officers and got out of his cell.  Wise testified that he was hit in the jaw, not slapped, but he could not tell who hit him. Wise was

taken to the infirmary and then to the University of Maryland Medical Center. Wise underwent surgery for a broken jaw, and multiple screws were placed in his jaw, which was wired shut.

Detective-Sergeant Christian Boodhoo of the Internal Investigative Division of the Department of Public Safety and Correctional Services testified for the State that the Department's policy requires correctional officers to "use the minimal amount of force reasonably necessary to accomplish [a] mission."[5] According to Detective-Sergeant Boodhoo, an open-hand slap to the face, or a punch to the face, was not the minimal amount of force required in this situation. Detective-Sergeant Boodhoo testified that he had seen a video of Trotman's encounter with Wise, and that Trotman could have put a knee on Wise and or laid on him while other correctional officers secured him.

The jury found Trotman guilty of second-degree assault and misconduct in office, and not guilty of conspiracy to commit second-degree assault. The circuit court sentenced Trotman to ninety suspended days of imprisonment, eighteen months of probation, and 200 hours of community service for second-degree assault, and sixty suspended days of imprisonment and eighteen concurrent months of probation for misconduct in office.

### Opinion of the Court of Special Appeals

Trotman appealed, and the Court of Special Appeals affirmed, holding that the circuit court did not err or abuse its discretion in excusing for cause the four prospective jurors who said that they could not use stairs. See Danny Trotman v. State, No. 2331, Sept.

---

[5]The circuit court did not admit Detective-Sergeant Boodhoo as an expert.

Term, 2016, 2019 WL 290022, at *21, *11 (Md. Ct. Spec. App. Jan. 15, 2019). The Court

of Special Appeals explained:

> The [circuit court] judge, a retired and specially assigned veteran of the Circuit Court for Baltimore City, drew upon her current and historical knowledge of the courthouse. . . . [W]hen [Trotman's] counsel suggested that another courtroom might possibly be able to accommodate the physical disabilities of [the four prospective] jurors[ at issue], the [circuit court] judge explained that Trotman's trial had been assigned to her, along with the courtroom [that was] usually occupied by [another circuit court] judge who was temporarily sitting in juvenile court, and, according to the [circuit court] judge, there was no other courtroom available for Trotman's two-day trial. When the [circuit court] judge provided that explanation at trial, [Trotman's] counsel did not dispute the lack of alternative courtrooms or challenge the adequacy of the [circuit court judge]'s investigation into alternative accommodations. Nor did [Trotman's counsel] suggest any of the alternative jury deliberation scenarios [that were] set forth in Trotman's [] brief. In the absence of any evidence in the record that there was another courtroom available, the [circuit court judge]'s finding is not clearly erroneous.

Id. at *15-16 (cleaned up).

## Petition for a Writ of *Certiorari*

Trotman petitioned for a writ of *certiorari*, raising three issues. This Court granted

the petition, limited to the issue that pertained to the circuit court excusing for cause the

four prospective jurors who said that they were unable to use stairs. See Trotman v. State,

463 Md. 526, 206 A.3d 315 (2019).

## DISCUSSION

## The Parties' Contentions

Trotman contends that the circuit court erred in striking for cause the prospective

jurors who indicated that they were unable to traverse stairs. Trotman notes that CJ § 8-

102(b) states in pertinent part: "A citizen may not be excluded from jury service due to . .

- 10 -

. disability[.]" Trotman argues that, in a criminal case, the defendant may assert a prospective juror's right to an opportunity to participate in jury service because the exclusion of a qualified prospective juror impinges the defendant's right to a fair trial. Trotman asserts that the grounds for disqualification are those that CJ § 8-103 sets forth, such as the juror being unable to comprehend spoken English or speak English, and that CJ § 8-103 does not indicate that being unable to use stairs is a ground for disqualification.

Trotman acknowledges that, even if a prospective juror is not disqualified under CJ § 8-103, a trial court has the discretion to excuse him or her. Trotman maintains, however, that the circuit court failed to exercise such discretion, as it failed to consider any options for accommodating the four prospective jurors at issue. Trotman contends that the circuit court should have contacted the administrative judge, the assignment office, or another circuit court judge, or dispatched a law clerk, to determine whether any other courtrooms were available. Trotman argues that, even if no other courtroom was available, the circuit court should have asked to use the jury room that accompanied a courtroom where no jury trial was ongoing or commandeered a conference room to use as a jury room.

The State responds that the circuit court properly exercised its discretion in excusing for cause the four prospective jurors at issue. The State agrees with Trotman that a prospective juror with a disability is not automatically disqualified, but may be excused for cause in the exercise of a trial court's discretion. The State contends that a trial court may excuse a prospective juror on a disability-related ground where, for practical reasons, the disability would prevent the prospective juror from rendering satisfactory jury service. In other words, the State argues that, although prospective jurors with disabilities cannot be

- 11 -

excluded from jury service across the board, on an individual basis, a trial court may excuse a prospective juror on a disability-related ground if the disability would interfere with the performance of the prospective juror's duties.

The State asserts that a trial court may determine whether an accommodation for a prospective juror with a disability would be reasonable. The State maintains that the circuit court considered Trotman's counsel's proposed accommodation—namely, using another courtroom—and found, as a matter of fact, that there were not any available. The State contends that it is reasonable to infer that another circuit court judge or court personnel informed the circuit court judge in this case that the courtroom to which she was assigned was the only courtroom available. The State argues that it was proper for the circuit court to take into account the time and effort to investigate the possibility of switching courtrooms, and then to move everyone involved—specifically, the circuit court judge, Trotman, his counsel, the prosecutor, the bailiff, the courtroom clerk, the law clerk, and the prospective jurors—to another courtroom.

**Standard of Review**

An appellate court reviews for abuse of discretion a trial court's excusal of a prospective juror for cause. Cf. Jenkins v. State, 375 Md. 284, 299, 825 A.2d 1008, 1017 (2003).

**Maryland and Federal Statutes**

CJ § 8-102(b) states: "A citizen may not be excluded from jury service due to color, disability, economic status, national origin, race, religion, or sex." CJ § 8-103 governs qualifications for jury service, and states:

(a) *Requirements.* — Notwithstanding [CJ] § 8-102[], an individual qualifies for jury service for a county only if the individual:

(1) Is an adult as of the day selected as a prospective juror;

(2) Is a citizen of the United States; and

(3) Resides in the county as of the day sworn as a juror.

(b) *Disqualifying factors.* — Notwithstanding [CJ § 8-103](a) [] and subject to the federal Americans with Disabilities Act, an individual is not qualified for jury service if the individual:

(1) Cannot comprehend spoken English or speak English;

(2) Cannot comprehend written English, read English, or write English proficiently enough to complete a juror qualification form satisfactorily;

(3) Has a disability that, as documented by a health care provider's certification, prevents the individual from providing satisfactory jury service;

(4) Has been convicted, in a federal or State court of record, of a crime punishable by imprisonment exceeding 6 months and received a sentence of imprisonment for more than 6 months; or

(5) Has a charge pending, in a federal or State court of record, for a crime punishable by imprisonment exceeding 6 months.[6]

(c) *Conviction.* — An individual qualifies for jury service notwithstanding a disqualifying conviction under [CJ § 8-103](b)(4) [] if the individual is pardoned.

In turn, 42 U.S.C. § 12132, part of the Americans with Disabilities Act, states:

"Subject to the provisions of this subchapter, no qualified individual with a disability shall,

---

[6]In 2019, the General Assembly amended Md. Code Ann., Cts. & Jud. Proc. (1974, 2013 Repl. Vol., 2018 Supp.) § 8-103(b)(4) and (5) to replace each instance of "6 months" with "1 year." 2019 Md. Laws (Ch. 750, S.B. 236). We quote the version of the statute that was effective at the time of the trial in this case.

by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." Disability discrimination includes

> a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford [] goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations[.]

42 U.S.C. § 12182(b)(2)(A)(ii).

## The Supreme Court's Case Law

In Batson v. Kentucky, 476 U.S. 79, 96 (1986), the Supreme Court held "that a defendant may establish a prima facie case of purposeful discrimination in selection of the petit jury solely on evidence concerning the prosecutor's exercise of peremptory [strike]s at the defendant's trial." In that case, the defendant was African-American; the prosecutor peremptorily struck all four African-American prospective jurors; and, only white jurors were seated. See id. at 82-83. The defendant's counsel moved to discharge the jury on the ground that the prosecutor's peremptory strikes violated the defendant's rights under the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States.[7] See Batson, 476 U.S. at 83. The trial court denied the motion to discharge. See id. The defendant was convicted, and the Supreme Court of Kentucky affirmed. See id. at 83-84.

---

[7] "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

The United States Supreme Court reversed and remanded. See id. at 84, 100. The Supreme Court observed that, in a prior case, it had "decided that the State denies a[n African-American] defendant equal protection of the laws when it puts him [or her] on trial before a jury from which members of his [or her] race have been purposefully excluded." Id. at 85 (citation omitted). Since the Supreme Court decided that prior case, "[a] recurring question . . . was whether the defendant had met his [or her] burden of proving purposeful discrimination on the part of the State." Id. at 90 (citations omitted). "A number of lower courts [had] reasoned that proof of repeated striking of [African-American]s over a number of cases was necessary to establish a violation of the Equal Protection Clause." Id. at 92. In Batson, the Supreme Court rejected that notion, see id. at 93, explaining "that a defendant may make a prima facie showing of purposeful racial discrimination in selection of the [jury panel] by relying solely on the facts concerning its selection *in his* [*or her*] *case*[,]" id. at 95 (emphasis in original).

The Supreme Court set forth a three-pronged test for a Batson challenge that is based on race. First, the defendant must establish a *prima facie* case of purposeful racial discrimination by "show[ing] that he [or she] is a member of a cognizable racial group, and that the prosecutor has exercised peremptory [strike]s to remove from the [jury panel] members of the defendant's race." Id. at 96 (citation omitted). Second, "the burden shifts to the [prosecutor] to come forward with a [race-]neutral explanation for" peremptorily striking prospective jurors who are the same race as the defendant. Id. at 97. Third, the trial court must "determine [whether] the defendant has established purposeful discrimination." Id. at 98 (footnote omitted).

The Supreme Court decided <u>Batson</u> in 1986, which was four years before Congress enacted the Americans with Disabilities Act in 1990. <u>See</u> Pub. L. 101-336 (July 26, 1990). Four years later, in <u>J.E.B. v. Alabama ex rel. T.B.</u>, 511 U.S. 127, 129 (1994), the Supreme Court held that, during jury selection, "the Equal Protection Clause forbids intentional discrimination on the basis of gender[.]" The Supreme Court did not mention people with disabilities in <u>Batson</u> or <u>J.E.B.</u>

Seven years after deciding <u>J.E.B.</u>, in <u>Bd. of Trs. of Univ. of Ala. v. Garrett</u>, 531 U.S. 356, 367-68 (2001), an employment discrimination case, the Supreme Court held that

> States are not required by the Fourteenth Amendment to make special accommodations for [people with disabilities], so long as their actions toward such individuals are rational. . . . If special accommodations for [people with disabilities] are to be required, they have to come from positive law[,] and not through the Equal Protection Clause.

(Footnote omitted).

Three years later, in <u>Tennessee v. Lane</u>, 541 U.S. 509, 533-34 (2004), the Supreme Court held that, "as it applies to the class of cases implicating the fundamental right of access to the courts," 42 U.S.C. § 12132—which states: "Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity"— "constitutes a valid exercise of Congress'[s] authority to enforce the guarantees of the Fourteenth Amendment." The Supreme Court observed that

> Congress enacted [42 U.S.C. § 12132] against a backdrop of pervasive unequal treatment in the administration of [S]tate services and programs, including systematic deprivations of fundamental rights. For example, . . . a

number of States have prohibited and continue to prohibit persons with disabilities from engaging in activities such as . . . serving as jurors.

Id. at 524 (footnote omitted). That said, the Supreme Court has never addressed the question of when it is a violation of the Americans with Disabilities Act for a trial court to excuse a prospective juror on a disability-related ground.

## Other Courts' Case Law

In United States v. Harris, 197 F.3d 870, 871-72 (7th Cir. 1999), the United States Court of Appeals for the Seventh Circuit held that a trial court did not violate a defendant's right to due process by allowing a prosecutor to peremptorily strike a prospective juror who had multiple sclerosis. In that case, during *voir dire*, the trial court asked whether any prospective juror "had a condition, such as dyslexia or being hard of hearing, of which the [trial] court should be aware so that accommodation could be arranged." Id. at 872. In response, the only African-American prospective juror "stated that she had multiple sclerosis and that she was on medication to control it, but that she might have trouble [with] stairs and staying awake." Id. (footnote omitted). The prosecutor peremptorily struck the prospective juror. See id. The trial court asked the prosecutor "for a race-neutral reason for the [peremptory] strike." Id. The prosecutor responded that the reason for the peremptory strike was that the prospective juror was "'on medication, and that sleep may be a problem for her with her multiple sclerosis.'" Id. (footnote omitted). Over the defendant's objection, the trial court allowed the peremptory strike and excused the prospective juror. See id. The defendant was convicted, and appealed. See id.

The Seventh Circuit affirmed. See id. at 876. The Seventh Circuit concluded that

people with disabilities "are not a suspect or quasi-suspect class[,]" and that, accordingly, the rational-basis test, rather than strict scrutiny, applied.[8]  See id.  The Seventh Circuit explained: "Unlike race or gender, the broad category of 'disability' is not 'unrelated to [a person's] fitness as a juror."  Id. at 875 (quoting Batson, 476 U.S. at 87).  The Seventh Circuit stated:

> Unlike race or gender, disability may legitimately affect a person's ability to serve as a juror.  For example, [] potential jurors [with disabilities] who would be unable to understand testimony at trial[,] or who would suffer pain or hardship from spending hours each day sitting in a courtroom[,] are properly excused from service for cause.

Harris, 197 F.3d at 875.  Addressing Harris's facts, the Seventh Circuit held that the prosecutor's peremptory strike of the prospective juror on disability-related grounds "did not violate the equal protection rights of either" the defendant or the prospective juror.  Id. at 876.  The Seventh Circuit explained:

> If the [prosecutor] had [peremptorily] struck [the prospective juror] because of an irrational animosity toward or fear of [people with disabilities], this

---

[8]A "suspect class" is a group of people who are subject to a "suspect classification"—that is, "[a] statutory classification based on race, national origin, or alienage, and thereby subject to strict scrutiny under" the Equal Protection Clause. *Suspect Classification*, Black's Law Dictionary (11th ed. 2019).  In turn, "[u]nder strict scrutiny, the [S]tate must establish that it has a compelling interest that justifies and necessitates the law in question." *Strict Scrutiny*, Black's Law Dictionary.

Meanwhile, a "quasi-suspect class" is a group of people who are subject to a "quasi-suspect classification"—that is, "[a] statutory classification based on gender or legitimacy, and therefore subject to intermediate scrutiny under" the Equal Protection Clause. *Quasi-Suspect Classification*, Black's Law Dictionary.  In turn, to survive intermediate scrutiny, a quasi-suspect "classification must be substantially related to the achievement of an important governmental objective." *Intermediate Scrutiny*, Black's Law Dictionary.

If a statute does not involve a suspect classification or a quasi-suspect classification, then the statute is subject to the "rational-basis test," under which a "court will uphold a [statute] if it bears a reasonable relationship to the attainment of a legitimate governmental objective." *Rational-Basis Test*, Black's Law Dictionary.

would not be a legitimate reason for excluding her from the jury. However, the [prosecutor peremptorily] struck [the prospective juror] because [the prosecutor's] stated concern, accepted by the [trial] court, was that she would become drowsy and would not be able to pay attention during the trial. This is a legitimate concern that is rationally related to the provision of a fair trial for [the defendant].

Id. (citations omitted).

In United States v. Santiago-Martinez, 58 F.3d 422, 423 (9th Cir. 1995) (per curiam), the United States Court of Appeals for the Ninth Circuit held that Batson "does not . . . prohibit peremptory strikes on the basis of obesity." In that case, the defendant's counsel raised a Batson challenge and alleged that three prospective jurors whom the prosecutor had peremptorily struck were obese. Santiago-Martinez, 58 F.3d at 423. The defendant's counsel also claimed that he was obese, though "he acknowledged that the defendant was not." Id. The trial court rejected the Batson challenge, and the defendant was convicted and appealed. Santiago-Martinez, 58 F.3d at 423. The Ninth Circuit affirmed, concluding that, although people who are obese are protected from discrimination under the Americans with Disabilities Act, discrimination against them is not subject to "heightened scrutiny." See id. at 423 & n.1.

In People v. Guzman, 555 N.E.2d 259, 260 (N.Y. 1990), the Court of Appeals of New York held that a trial court did not err in denying a defendant's motion to excuse for cause a prospective juror who was deaf. In that case, one of the prospective jurors could read, write, and speak English, but could not hear; "[a]lthough he [was] able to read lips, he was assisted during jury selection by a court-appointed sign language interpreter." Id. The defendant moved to strike the prospective juror for cause, contending that his deafness

"would prevent him from judging the witnesses' credibility[,] and that the interpreter's presence in the jury room would inhibit deliberations and violate the confidentiality of the deliberative process." Id. at 261. The trial court denied the motion to strike for cause. See id. The defendant peremptorily struck the prospective juror, and used up the rest of his peremptory strikes. See id. The defendant was convicted, and the Appellate Division of the Supreme Court of New York affirmed. See id. The Court of Appeals of New York affirmed as well, concluding that the prospective juror would have been able to discharge his duties as a juror, and that the sign language interpreter's presence during deliberations would not have interfered with the defendant's rights. See id. at 260, 262-63.

In People v. Falkenstein, 732 N.Y.S.2d 817, 818 (N.Y. App. Div. 2001), the Appellate Division of the Supreme Court of New York held that a trial court did not err in allowing a prosecutor to peremptorily strike a prospective juror who had difficulty hearing. In that case, the prosecutor expressed concern "that the hearing impairment of the prospective juror would affect her ability to assess [] audiotape evidence because, as noted by the prosecutor, the inflections of [the] defendant's voice on the audiotapes were significant to the [government]'s case." Id. The Appellate Division observed: "While it is impermissible to exercise a peremptory [strike] on the basis of race . . . , no such prohibition applies to physical disabilities." Id. (citing Batson, 476 U.S. 79; Harris, 197 F.3d at 874-875). The Appellate Division explained: "While the prosecutor's concerns about the ability of the prospective juror to serve as a juror may not have warranted her dismissal for cause, the concerns provided a legitimate basis for the exercise of the peremptory [strike]." Falkenstein, 732 N.Y.S.2d at 818 (citing three cases, including Guzman, 555 N.E.2d 259,

and Harris, 197 F.3d at 876).

In People v. Caldwell, 603 N.Y.S.2d 713, 713 (N.Y. Crim. Ct. 1993), the Criminal Court of the City of New York supplemented an oral ruling in which it allowed a juror with vision impairments to continue serving on the jury. In that case, the juror's vision impairments were "not discovered until the second day of trial." Id. At that time, the juror "disclosed that she had a detached retina in one eye[,] and had limited vision in her other eye." Id. The juror explained that, from where she was sitting in the jury box, "she could see only the outline[s] of the witnesses' faces, but could not see all the details of their facial expressions." Id. at 713-14. She also disclosed that it was "difficult, if not impossible, for her to read standard size print"; but, she had "special reading glasses [that] made it easier for her to read enlarged print." Id. at 714.

At trial, the Court noted that the Americans with Disabilities Act required it to reasonably accommodate the juror. See id. at 714. The Court had the juror move, for the duration of all remaining testimony, to the seat in the jury box that was closest to the witness box; the Court read into the record all documents that it admitted into evidence; the Court described the layouts of certain documents; and the Court caused to be given to the juror an enlarged print version of a transcript of an audiotape that was offered into evidence. See id.

The Court explained that it "was not obligated to disqualify [the juror] merely because the [defendant] introduced some photographs at trial." Id. at 715. The photographs purportedly showed bruises on the defendant's face, and were offered to corroborate the defendant's testimony that the victim had assaulted the defendant. See id.

- 21 -

The Court determined that, although it was likely that the juror could not see the photographs clearly, she "had sufficient information to enable her to evaluate the plausibility of the witnesses' testimony" because the Court described the photographs to the juror, and because "the defendant testified in great detail about the many indignities, slights[,] and abuses [that] she claimed the [government's] witnesses had committed against her[.]" Id. at 715-16. The Court explained:

> It is difficult to imagine a trial in which absolutely no documents, diagrams, police reports, photographs or physical evidence are introduced. If this court were to hold that [the juror] was disqualified simply because a few documents and a few photographs were presented, it would, in effect, be concluding that there were almost no cases on which [jurors with vision impairments] or [] jurors [who are blind] could sit. Such a ruling would violate the spirit and intent of the [Americans with Disabilities Act]. . . . Rather, the question is whether the court could accommodate the juror by [orally] describing the evidence or by any other means, and whether the evidence is so crucial that the juror's inability to see it denied the defendant a fair trial. In this case, the [C]ourt finds that the defendant was not denied due process[,] and adheres to its oral ruling permitting [the juror] to [continue] sit[ting] on the jury.

Id. at 716.

In Donelson v. Fritz, 70 P.3d 539, 544-45 (Colo. App. 2002), the Colorado Court of Appeals held that a trial court did not err in rejecting a plaintiff's Batson challenge[9] where the defendant peremptorily struck two prospective jurors with disabilities. In that case, the plaintiff sued the defendant for injuries that resulted from a car accident. See Donelson, 70 P.3d at 541. The plaintiff alleged that his injuries were painful and permanent, and required him to reduce his personal and work-related activities. See id. at 543. During

---

[9]Batson applies to both criminal cases and civil cases. See Edmonson v. Leesville Concrete Co., 500 U.S. 614, 616 (1991).

- 22 -

*voir dire*, the defendant's counsel peremptorily struck a prospective juror who had "disabling rheumatoid arthritis[,]" as well as a prospective juror who had "a hip condition." Id. at 543-44. The plaintiff's counsel raised a Batson challenge on the ground that the defendant's counsel was discriminating against prospective jurors with disabilities. See Donelson, 70 P.3d at 543-44. The defendant's counsel responded that the prospective juror who had disabling rheumatoid arthritis could have difficulty sitting through long days of trial and could "be sympathetic to plaintiff's claims of back pain and impairment[,]" and that the prospective juror who had a hip condition could have difficulty concentrating at trial. Id. at 544. The trial court rejected the Batson challenge, "expressing some uncertainty [about] whether *Batson* had been extended to persons with disabilities, [and] conclud[ing] that it was not improper, in a case dealing with a person with [a] disability and chronic pain, to exclude people with similar conditions." Donelson, 70 P.3d at 544. The jury found in the defendant's favor, and the plaintiff appealed. See id. at 541.

The Colorado Court of Appeals affirmed. See id. The Court held that, "assum[ing] that the physical conditions from which [the prospective] jurors suffered constituted disabilities within the meaning of the [Americans with Disabilities Act], the trial court did not err in denying [the] plaintiff's *Batson* challenge[.]" Donelson, 70 P.3d at 544-45. The Court "agree[d] with the rationale of" multiple cases from other jurisdictions—including Harris, 197 F.3d 870, Santiago-Martinez, 58 F.3d 422, and Falkenstein, 732 N.Y.S.2d 817—and "conclude[d] that Batson does not apply to peremptory" strikes of prospective jurors with disabilities. Donelson, 70 P.3d at 544.

**Analysis**

Here, guided by the Americans with Disabilities Act, Maryland statutes that govern jury service, and relevant case law, we conclude that a trial court may not summarily excuse for cause prospective jurors with disabilities; instead, a trial court may excuse a prospective juror for cause on a disability-related ground if no reasonable accommodation is possible, and, at that particular trial, the particular disability would prevent the prospective juror from providing satisfactory jury service.

We begin with our conclusion that a trial court may not summarily excuse for cause prospective jurors with disabilities. To be sure, people with disabilities do not constitute a suspect, or quasi-suspect, class; accordingly, the Equal Protection Clause does not require trial courts "to make special accommodations for [prospective jurors with disabilities], so long as their actions toward such individuals are rational." Garrett, 531 U.S. at 367. By way of illustration, in Harris, 197 F.3d at 876, the Seventh Circuit held that a peremptory strike of a prospective juror with multiple sclerosis did not violate her, or the defendant's, rights under the Equal Protection Clause because the government had "a legitimate concern that [was] rationally related to the provision of a fair trial"—namely, a concern "that [the prospective juror] would become drowsy and would not be able to pay attention during the trial." In sum, a Batson challenge (which arises out of the Equal Protection Clause) may be properly based only on a prospective juror's race or gender—not on a prospective juror's disability. See Harris, 197 F.3d at 875; Santiago-Martinez, 58 F.3d at 423 & n.1; Falkenstein, 732 N.Y.S.2d at 818; Donelson, 70 P.3d at 544.

But, Maryland and federal statutes protect prospective jurors from disability

- 24 -

discrimination. Specifically, CJ § 8-102(b) provides in pertinent part: "A citizen may not be excluded from jury service due to . . . disability[.]" And, under the Americans with Disabilities Act, generally, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in . . . the . . . activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Jury service constitutes an activity of a public entity—namely, a trial court. In short, under CJ § 8-102(b) and 42 U.S.C. § 12132, prospective jurors with disabilities have a right to an opportunity to participate in jury service. We fully agree with the National Center for State Courts and the State Justice Center Institute that, "[f]or jury service, people with disabilities must be afforded the opportunity to participate in all the same ways as [people without disabilities]. Summarily removing [people with disabilities] from [jury] service . . . is a violation of the Americans with Disabilities Act." Deborah Smith and Greg Hurley, Jurors with Disabilities: A Discussion of the Americans with Disabilities Act and Other Statutory Requirements Requiring Accommodations for [People with Disabilities], and Practical Information To Be Compliant, National Center for State Courts and the State Justice Center Institute ("Jurors with Disabilities"), at 5 (2018), https://www.ncsc.org/~/media/Microsites/Files/CJS/Other/Juror%20with%20Disabilities%20Final%20Report.ashx [https://perma.cc/2GMW-K7AW].

Under the Americans with Disabilities Act, failing to make reasonable accommodations constitutes disability discrimination, whereas failing to make fundamental alterations does not. See 42 U.S.C. § 12182(b)(2)(A)(ii). Thus, "[c]ourts are not required to provide an accommodation if it fundamentally alters jury service." Jurors

- 25 -

with Disabilities at 25. And, "[a] person should be excused from jury service only for mental or physical disability [that], despite reasonable accommodation for the disability, substantially impairs the capacity to serve[.]" Am. Bar Ass'n, Criminal Justice Section Standards, Standard 15-2.1(d) (Dec. 5, 2018), https://www.americanbar.org/groups/criminal_justice/publications/criminal_justice_section_archive/crimjust_standards_jurytrial_blk/ [https://perma.cc/FQK3-39VJ]. Consistent with the Americans with Disabilities Act and the Maryland statutes that govern jury service, a trial court may excuse a prospective juror for cause on a disability-related ground if no reasonable accommodation is possible, see 42 U.S.C. § 12182(b)(2)(A)(ii), and, at that particular trial, the particular disability would prevent the prospective juror "from providing satisfactory jury service[,]" CJ § 8-103(b)(3).[10]

Just as there are multiple types of disabilities, there are multiple examples of reasonable accommodations for prospective jurors. In Guzman, 555 N.E.2d at 260, where a court-appointed sign language interpreter assisted a prospective juror who was deaf, New

---

[10]CJ § 8-103(b)(3) contemplates that "a health care provider's certification" can establish that a disability "prevents the individual from providing satisfactory jury service[.]" The language regarding "a health care provider's certification" is clearly intended to prevent a person from avoiding jury service by falsely claiming to have a disability. But, that is a moot point by the time that a person with a disability reports for jury duty and becomes a prospective juror at a particular trial. At that time, the trial court must determine whether the prospective juror can provide satisfactory jury service at a particular trial. CJ § 8-103(b)(3) does not preclude a trial court from finding, in the absence of a health care provider's certification, that a prospective juror has a disability that, at that particular trial, would prevent the prospective juror "from providing satisfactory jury service[.]" Guided by the standard set forth in CJ § 8-103(b)(3), we determine that a trial court may excuse a prospective juror for cause based on a disability if no reasonable accommodation is possible and the disability would prevent the prospective juror from "providing satisfactory jury service" at a particular trial.

York's highest court concluded "that the prospective juror's deafness did not render him incapable of performing in a reasonable manner the duties of a juror." (Cleaned up). And, in Caldwell, 603 N.Y.S.2d at 713-14, the Criminal Court of the City of New York made multiple reasonable accommodations for a juror with vision impairments, including reading into the record all documents that the Court admitted into evidence.

The takeaway is that, generally, the Americans with Disabilities Act prohibits a trial court from reaching the blanket conclusion that a certain disability would necessarily preclude jury service at any given trial. Suppose, for instance, that a prospective juror has a vision impairment, or is blind. As the Criminal Court of the City of New York explained in Caldwell, 603 N.Y.S.2d at 716, if a trial court reasons that a prospective juror who has a vision impairment, or is blind, is "disqualified simply because a few documents and a few photographs [are to be] presented, it would, in effect, be concluding that there were almost no cases on which [jurors with vision impairments] or [] jurors [who are blind] could sit. Such a ruling would violate the spirit and intent of" the Americans with Disabilities Act.

When determining whether it is permissible to excuse for cause a prospective juror on a disability-related ground, a trial court must engage in an individualized, case- and disability-specific inquiry. Multiple cases provide examples of such an inquiry. In addition to the above-discussed cases of Guzman, 555 N.E.2d at 260, and Caldwell, 603 N.Y.S.2d at 713-14, there is Falkenstein, 732 N.Y.S.2d at 818, in which the Appellate Division of the Supreme Court of New York held that a trial court did not err in allowing a prosecutor to peremptorily strike a prospective juror who was hard of hearing, where the prosecutor

noted that "the inflections of [the] defendant's voice on the audiotapes were significant to the [government]'s case." And, in Donelson, 70 P.3d at 541, 543-44, where a plaintiff sued a defendant for injuries that resulted from a car accident, and the defendant's counsel peremptorily struck a prospective juror with disabling rheumatoid arthritis and another prospective juror with a hip condition, the Colorado Court of Appeals affirmed the judgment of a trial court that concluded that "it was not improper, in a case dealing with a [plaintiff] with [a] disability and chronic pain, to exclude [prospective jurors] with similar conditions." Only by making disability-related determinations on a case-by-case basis can a trial court safeguard the right of prospective jurors with disabilities to an opportunity to participate in jury service.[11]

Applying relevant statutes and case law to this case's circumstances, we have no trouble concluding that the circuit court did not abuse its discretion in excusing for cause the four prospective jurors who indicated that they were unable to use stairs. Indeed, the record reflects that the circuit court acted appropriately and respectfully throughout its interactions with the four prospective jurors.

Although the Maryland Judiciary is moving toward having courthouses that are entirely accessible, the record establishes that a staircase with twenty-five steps was the only way to reach the jury room that accompanied the courtroom that was used for the trial

---

[11]On a related note, if a trial court excuses a prospective juror for cause on a disability-related ground, generally, the trial court should not indicate that he or she is dismissed for the day; instead, time permitting, the trial court should direct the prospective juror to return to the jury assembly room so that he or she may have an opportunity to serve as member of another jury panel, and, possibly, be seated as a juror at another trial.

in this case. The circuit court expressly noted that there was no elevator to the jury room. The record makes clear that, before the jury panel entered the courtroom, the four prospective jurors at issue disclosed to the Jury Commissioner's Office that they were unable to use stairs, and the Jury Commissioner's Office made the circuit court aware of that information. The circuit court separately called each of the four prospective jurors to the bench. In each instance, first, the circuit court expressly confirmed that the prospective juror was unable to use stairs; then, the circuit court informed the prospective juror that a staircase with twenty-five steps was the only way to reach the jury room; and, finally, the circuit court excused the prospective juror and directed the prospective juror to return to the jury assembly room. The circuit court respected the prospective jurors' privacy by speaking with each one individually at the bench and refraining from asking what their respective medical conditions were, or otherwise inquiring into why the prospective jurors were unable to traverse stairs.

At no time did the circuit court state or imply that any of the four prospective jurors could never be seated as jurors in any given trial. To the contrary, in interacting with each of the four prospective jurors, the circuit court clearly contemplated that the prospective juror could be seated as a juror at another trial. The circuit court told Juror 376 that it would "excuse [her] from serving on this jury[,]" and advised her that, if she became part of another jury panel, she should inform the other circuit court judge "if there[ was] any other reason why [she] shouldn't serve as [a] jur[or]." The circuit court told Juror 408: "[T]here are courtrooms that are on the same level[ as their jury rooms], but this is not one of them." The circuit court stated to Juror 624: "I'm going to excuse you from serving on

- 29 -

this jury. . . . They do have courtrooms on the same level[ as their jury rooms], so there are no steps involved. . . . So you may be selected for one of them[.]" Finally, the circuit court informed Juror 404 that she "couldn't serve on this jury[.]"

After the circuit court excused for cause the four prospective jurors at issue, Trotman's counsel objected and noted that one of them had indicated that she could serve as a juror if there were an elevator to the jury room. The circuit court asked Trotman's counsel: "[H]ow would you have suggested [that] I accommodate her?" Trotman's counsel responded: "That we go to another courtroom[.]" The circuit court explained that, "in the Baltimore City Circuit Court[,] every single courtroom is being used. I, as a senior judge, fill up the empty courtroom"; and that the designated courtroom was available for the trial only because the circuit court judge who usually presided in that courtroom had been assigned to juvenile court.

Significantly, the circuit court's statement that, "in the Baltimore City Circuit Court[,] every single courtroom [was] being used" constitutes a finding of fact. An appellate court cannot set aside a trial court's finding of fact unless it is clearly erroneous. See Givens v. State, 459 Md. 694, 711, 188 A.3d 903, 913 (2018). Here, absolutely nothing in the record indicates that, contrary to the circuit court's finding, another courtroom was available. The circuit court's finding was not clearly erroneous.

The circuit court's actions were in complete accord with our holding that a trial court may not summarily excuse for cause prospective jurors with disabilities, and that a trial court may excuse a prospective juror for cause on a disability-related ground if no reasonable accommodation is possible, and, at that particular trial, the particular disability

would prevent the prospective juror from providing satisfactory jury service. It is undisputed that, to reach the jury room, the jurors would have been required to walk up twenty-five steps. Each of the four prospective jurors at issue indicated that he or she was unable to do so. In this particular case, the four prospective jurors' inability to use stairs prevented them "from providing satisfactory jury service[.]" CJ § 8-103(b)(3). There is no evidence that a reasonable accommodation was possible; indeed, there was no elevator to the jury room, and the circuit court concluded no other courtroom was available.

Trotman takes issue with the circuit court's conclusion that no other courtroom was available. Trotman contends that the circuit court should have either contacted the administrative judge or assignment office, or another circuit court judge, or dispatched a law clerk, to determine whether any other courtrooms, jury rooms or conference rooms were available. Trotman's contention is premised on speculation that another courtroom might have been available, and that the circuit court did not have sufficient information to conclude that no accommodation could be made for the jurors who could not use stairs. We disagree. As noted by the Court of Special Appeals, this was "a retired and specially assigned veteran of the Circuit Court for Baltimore City, [who] drew upon her current and historical knowledge of the courthouse" to find that this was the courtroom that had been assigned to her and that there was no other courtroom available. Trotman, 2019 WL 290022, at *15.

Although, theoretically, the circuit court could have conducted *voir dire* while court personnel made such inquiries, the circuit court could not have begun seating a jury, and allowing peremptory strikes, without first confirming whether it needed to excuse for cause

- 31 -

the four prospective jurors at issue on the ground that they said that they were unable to traverse stairs. As a practical matter, whether the Circuit Court of Baltimore City has a policy that permits senior judges to switch courtrooms with other judges is unknown, as is whether another circuit court judge with a jury room that did not have stairs, and who would have been amenable to switching courtrooms, was available. Trotman bases his argument on the theory that another circuit court judge with a jury room without stairs may have been willing and able to switch courtrooms or allow the use of his or her jury room, and/or that there may have been a conference room that was nearby, available, and able to substitute for a jury room. There is no information in the record that any of these things were possible, or that they could have been accomplished within a reasonable time during the jury selection process. At bottom, Trotman's argument comes down to an allegation that the circuit court failed to adequately investigate the possibility of a reasonable accommodation. In this instance, the circuit court judge, utilizing her knowledge of the Circuit Court for Baltimore City, found the following facts: namely, that she was a senior judge who had been assigned to a vacant courtroom, that the courtroom was available because the judge who was regularly assigned to that courtroom was serving in a different court (Juvenile Court), and that no other courtrooms were available. The circuit court promptly excused for cause the four prospective jurors at issue, who had indicated that they could not use the stairs, and ensured that the jurors would return to the jury assembly room as soon as practicable to be available for serving on another jury panel. Under the circumstances of this case, the circuit court did not clearly err in finding that no other

- 32 -

courtroom was available, and the circuit court's actions were completely proper exercises

of discretion.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. PETITIONER TO PAY COSTS.**